## COMMONWEALTH *vs.* JEFFREY R. JONES.

Plymouth.    March 7, 1988. — August 18, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Rape. Constitutional Law*, Assistance of counsel, Waiver of
   constitutional rights. *Waiver. Attorney at Law*, Conflict of interest. *Con-
   flict of Interest. Practice, Criminal*, Assistance of counsel. *Joint Enter-
   prise.*

A criminal defendant's constitutional right to effective assistance of counsel
   was not violated by his attorney's alleged conflict of interest at the time
   the defendant was interviewed by the police, where the defendant had
   no constitutional right to counsel at the time of the interview. [286-287]
A criminal defendant knowingly, intelligently and unequivocally indicated,
   during a thorough examination by the trial judge, that he understood the
   circumstances regarding the possibility of his attorney's conflict of in-
   terest and that he wished to continue to be represented by the same
   counsel. [287]
A judge's failure to provide independent counsel to assist a criminal defend-
   ant in deciding whether to waive his right to conflict-free counsel at his
   trial, did not, in the circumstances, render the defendant's waiver of
   that right invalid. [287-288]
A criminal defendant was not deprived of his right to effective assistance
   of counsel by his attorney's use of a trial strategy that was deliberate
   and not irrational, where the record showed that the defendant both
   understood and acquiesced in his counsel's actions. [288-289]
The judge at a murder trial correctly instructed the jury on the theory of
   joint enterprise, even though the sole codefendant had been acquitted
   of the charge, where the evidence suggested to the jury the possibility
   that there was more than one assailant and was sufficient to show that
   the defendant was at least a participant in the crime and that he possessed
   the state of mind required for guilt. [289-290]

INDICTMENTS found and returned in the Superior Court De-
partment on September 30, 1981.

The cases were tried before *Augustus F. Wagner, Jr.*, J.
*William C. Madden* for the defendant.

*Robert P. Snell*, Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. On September 12, 1981, the body of a woman (the victim) was found lying face down in a shallow stream in Brockton. She had been raped, beaten, and strangled. Police investigation disclosed that she had last been seen alive the night before in the company of the defendant and one Richard Palaza. Complaints were issued charging each with assault with intent to rape. Palaza was arrested. The police obtained a warrant for the defendant's arrest as well, but were unable to locate him, as he had left the State.

On September 20, Captain John Bukunt and Sergeant Robert Morrill of the Brockton police department met with attorney Kenneth Elias, who had been retained by the defendant. They told Mr. Elias that they had heard that the defendant was telling an account of the victim's death to the effect that Palaza alone had raped and murdered the victim, while the defendant had merely helped to dispose of the body. They also told Mr. Elias that, if the defendant's story were true, he should return to Massachusetts to testify against Palaza. Mr. Elias told the officers that he wanted the defendant to receive a grant of immunity from prosecution in exchange for his testimony. Captain Bukunt agreed to discuss the subject of immunity with the assistant district attorney assigned to the investigation, Bernard Mulholland.

On September 21, Mr. Elias met with Captain Bukunt, Sergeant Morrill, and Mr. Mulholland at the Plymouth court house. After some negotiation, Mr. Elias and Mr. Mulholland reached an agreement. Mr. Elias then brought in the defendant for questioning. Before any substantive questions were asked of the defendant, Mr. Elias memorialized the agreement on the audiotape of the meeting.[1] The defendant was then questioned. The substance of his statement was that Palaza alone

---

[1] MR. ELIAS: "Let me put on tape, too, what our agreement was or what I perceive it to be that JEFF JONES has voluntarily appeared here today for the purposes of telling you what he knows on an investigation of the death of [the victim]. Assuming his testimony is the truth and doesn't appear to be a fabrication, that if the investigation were to determine that he's guilty,

had raped and killed the victim, while the defendant merely had helped to dispose of the body. The defendant subsequently testified to this effect before a grand jury investigating the victim's death.

The police and the grand jury continued their investigation. On September 29, Palaza, at his own request, gave a statement to the police and testified before the grand jury, to the effect that the defendant alone had raped and killed the victim, and that he, Palaza, merely had helped to dispose of the body. Ultimately, the grand jury indicted both Palaza and the defendant on charges of aggravated rape and murder.

Sometime in December, 1983, an assistant district attorney brought to Mr. Elias's attention the possibility of a conflict of interest in Mr. Elias's representation of the defendant. Mr. Elias was then representing Captain Bukunt and other members of the Brockton police department on unrelated civil matters. Although the issue had not occurred to him at the time he was retained to represent the defendant, and he did not believe that his representation of Bukunt and the other officers conflicted with his representation of the defendant, Mr. Elias immediately discussed the matter with the defendant. The defendant told him that he did not perceive a conflict, and that he wanted Mr. Elias to continue to represent him. On March 12, 1984, when the case came before the Superior Court, a judge examined the defendant concerning the possibility of a conflict of interest between Mr. Elias's representation of Captain Bukunt and other Brockton police officers and his representation of the defendant. [2] The judge concluded that the defendant fully

---

of the crime of Accessory After the Fact, and no more, that there would be no prosecution for that crime in exchange for his cooperation in the investigation."

CAPTAIN BUKUNT: "That's correct."

In addition, as part of the agreement, at the defendant's arraignment on the charge of assault with intent to rape, the district attorney's office recommended that the defendant, a parolee, be released on his own recognizance.

[2] THE JUDGE: "Mr. Jones, let me first inform you that I am going to ask you a series of questions related only to the continued representation to be provided to you by Mr. Elias and his representation apparently, in light of

understood the circumstances, and that he had voluntarily and intelligently decided to continue to be represented by Mr. Elias.

---

the assistant district attorney's statements, of certain police officials that may be involved in the investigation of this case. Do you understand that?"

THE WITNESS: "Yes."

THE JUDGE: "You understand what I just said?"

THE WITNESS: "Yes."

THE JUDGE: "If you would identify youself for the record, please?"

THE WITNESS: "Jeffrey Jones."

THE JUDGE: "Have you consumed any alcoholic beverages or taken any drugs in the last 24 hours?"

THE WITNESS: "No."

THE JUDGE: "Are you under the influence of any alcoholic beverage or drugs at this time?"

THE WITNESS: "No."

THE JUDGE: "Have you ever been treated for any mental illness?"

THE WITNESS: "No."

THE JUDGE: "Are you aware of any mental illness that you now may be suffering from?"

THE WITNESS: "No."

THE JUDGE: "You have had Mr. Elias representing you throughout the course of the proceedings in this case, is that correct?"

THE WITNESS: "Yes, it is."

THE JUDGE: "Mr. Elias, could you state for the record what the representation is that you are purported or alleged to have regarding certain members of the Brockton Police Department?"

DEFENSE COUNSEL: "Judge, a short time ago the district attorney said to me, 'I understand you represent Capt. John Bukunt in his civil proceeding that is ongoing?' and I said, 'That's true,' which commenced even before my representation of Mr. Jones, and over the years and currently I represented a number of the Brockton Police on civil matters, civil rights violations, etc. I continue to do that. I represent at the present time, Capt. Bukunt on a civil matter and maybe 10 to 12 of the Brockton Police officers on civil matters. Mr. Jones is aware of that. I didn't make him aware of that until the district attorney suggested to me that it might be a problem to him. But Mr. Jones is aware of it and I told him whatever the involvement was."

THE JUDGE: "Alright."

THE JUDGE: "Mr. Jones, did you hear the statement for the record that was made by your counsel?"

THE WITNESS: "Yes, I did."

THE JUDGE: "Do you understand that, at least on its face, that can appear to be a conflict of interest? In other words, he has represented individuals who may be either testifying against your interests in this case or may be bringing forward evidence in this case against you. Do you understand it?"

THE WITNESS: "Yes."

Palaza was tried separately and was acquitted. In July, 1984, after Palaza's trial, and before his own, the defendant filed a motion to dismiss the indictments on the ground that the Commonwealth had violated its agreement not to prosecute him.

THE JUDGE: "Have you discussed that fully with Mr. Elias?"

THE WITNESS: "Yes, I have."

THE JUDGE: "Do you understand the nature of the circumstances or the nature of the situation as it relates to his representation to be provided to you not only to this point in time but from this point in time until the completion of the case?"

THE WITNESS: "Yes, sir."

THE JUDGE: "Do you have any concerns regarding that or reservations that you want to make known to me at this time?"

THE WITNESS: "I have no reservations."

THE JUDGE: "You understand that, if I wished, I could have Mr. Elias withdraw as your counsel and, if you couldn't afford counsel, appoint counsel for you?"

THE WITNESS: "I understand that that's possible."

THE JUDGE: "You understand that."

THE WITNESS: "Yes."

THE JUDGE: "Which do you wish to do at this time?"

THE WITNESS: "I wish to remain with Mr. Elias as my attorney."

THE JUDGE: "Are you satisfied that you have fully discussed with Mr. Elias your situation as it relates to any conflicts that he may have? In other words, his representation of certain members of the Brockton Police Department?"

THE WITNESS: "Yeah, we've discussed it and I don't feel there are any conflicts."

THE JUDGE: "You understand that that representation is still ongoing?"

THE WITNESS: "Yes."

THE JUDGE: "Now, is this decision made with your own free will?"

THE WITNESS: "Yes, it was."

THE JUDGE: "Is it still made of your own free will?"

THE WITNESS: "Yes, it is."

THE JUDGE: "Has anyone threatened you or made promises to you of reward or otherwise regarding the decision to keep Mr. Elias in as your counsel?"

THE WITNESS: "No."

THE JUDGE: "Is it made of your own free will?"

THE WITNESS: "Yes, it is."

THE JUDGE: "It is made intelligently, in other words, you understand what type of decision you are being asked to make?"

THE WITNESS: "Yes, I do."

THE JUDGE: "Is there anything further you wish to ask me regarding this set of circumstances or that you wish to have inquired of us, either Mr. Elias or others?"

THE WITNESS: "No."

At the hearing on the motion, Captain Bukunt testified as to the events surrounding the making of the agreement and the defendant's testifying. Mr. Elias represented to the court that Captain Bukunt had committed perjury in his testimony, and that it would be necessary for Mr. Elias to testify in the defendant's behalf. Mr. Elias subsequently filed a motion to suppress the defendant's statement and grand jury testimony; however, it was marked, "Late Don't Docket," and no hearing on the motion was held. Neither Captain Bukunt nor Mr. Elias testified at the defendant's trial.

After the hearing, the judge denied the defendant's motion to dismiss the indictments, on several grounds.[3] First, he ruled that the Commonwealth had not violated the literal terms of the agreement, as the promise not to prosecute applied only to the crime of being an accessory after the fact, and not to that of being a principal to rape and murder. Second, the judge concluded that the agreement was expressly conditioned on the occurrence of two contingencies; namely, the Commonwealth's subjective, good faith belief that Jones was telling the truth, and the independent corroboration, through further investigation, of Jones's story that he had participated in the crimes only as an accessory after the fact, and that these conditions had failed. Finally, the judge concluded that Jones had not relied on the Commonwealth's promise.

At trial, the defense presented no witnesses and the defendant did not take the stand. Prior to charging the jury, the judge conferred with counsel regarding the instructions he intended to give the jury. The prosecutor stated that he was proceeding, in part, on the theory that Palaza and the defendant were joint venturers in the rape and murder of the victim. Mr. Elias

---

THE JUDGE: "You may stand down. [Witness complies.] I am satisfied that he wishes to have Mr. Elias remain on the case, that he has made an intelligent and free and voluntary decision to do so with full understanding of the circumstances."

[3] On appeal, Jones does not squarely challenge the judge's denial of his motion to dismiss the indictments, but points to the inefficacy of his agreement with the Commonwealth to support his claim that he was denied effective assistance of counsel.

questioned the propriety of such an instruction, in light of Palaza's previous acquittal. Later in the conference, the judge stated that he would instruct the jury on the theory of joint venture,[4] and the defendant saved his rights as to this instruction.

The jury found the defendant guilty of aggravated rape and of murder in the first degree. He was sentenced to concurrent life terms at the Massachusetts Correctional Institution at Cedar Junction.

The defendant, with new counsel, filed a postconviction motion for a new trial, alleging that he was denied a fair trial, in contravention of his Federal and State constitutional rights, because his trial counsel, Mr. Elias, labored under a conflict of interest which deprived the defendant of effective assistance of counsel. After hearing, the trial judge denied this motion.

On this appeal from convictions and from the denial of his motion for a new trial, the defendant renews his contention that his trial counsel, Mr. Elias, labored under a conflict of interest which deprived the defendant of his constitutional rights to effective assistance of counsel. He further contends that the trial judge, in deciding to instruct the jury on the theory of joint venture, improperly took into consideration extra-record evidence presented at Palaza's previous trial, at which the same judge presided, and so denied the defendant his constitutional right to procedural due process. We reject both these contentions, and now affirm.

---

[4] The judge stated to counsel, in the absence of the jury, the following, which, as seen *infra*, is the basis of one of the defendant's appellate arguments: "That brings us to joint venture, and I'm satisfied on the law, the Commonwealth is permitted to set forth that as a theory in this particular case, even though the defendant, Richard Palaza, was found not guilty by a prior jury. Having been the trial judge on that case, although it is probably not needed on this ruling, but having been the trial judge on the Palaza case, I'm satisfied that the evidence submitted to that jury was sufficient, if believed by a jury, to have warranted for a finding of guilty. It's obvious that the jurors did not find that evidence to be sufficient, and on that basis, Mr. Palaza was found not guilty. I'm satisfied, if it has any basis in light of the recent thinking of the Supreme Judicial Court on other matters, that evidence submitted at that trial was sufficient, if believed, to return verdicts of guilty on the crimes charged, as well as on the theory of joint venture."

1. *Ineffective assistance of counsel; conflict of interest.* The defendant contends, first of all, that his constitutional rights to counsel were violated because Mr. Elias rendered ineffective assistance, as a result of his conflict of interest, at the time the defendant originally was interviewed by the police and the prosecutor. We need not address the question whether Mr. Elias was at this early stage burdened by a conflict of interest, as we conclude that the defendant had no constitutional right to counsel at the time of his interrogation.

"[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby* v. *Illinois,* 406 U.S. 682, 688 (1972), and cases cited. The same is true of the right to counsel under art. 12 of the Declaration of Rights of the Massachusetts Constitution. See *Commonwealth* v. *Simmonds,* 386 Mass. 234, 238 (1982). Although a complaint and an arrest warrant had been issued prior to Mr. Elias's alleged ineffectual assistance, this does not constitute the commencement of "adversary proceedings" in Massachusetts. *Commonwealth* v. *Smallwood,* 379 Mass. 878, 884 (1980). See *Commonwealth* v. *Mahoney,* 400 Mass. 524, 528-529 (1987) (dictum); *Commonwealth* v. *Mandeville,* 386 Mass. 393, 401 (1982) (dictum); *Simmonds, supra* at 237-238 (dictum). Having no constitutional right to counsel at this stage in the proceedings, the defendant can scarcely succeed on a claim that the counsel he did have rendered ineffective assistance. "The right to effective assistance of counsel can be no broader than the right to counsel on which it is based."[5] *People* v. *Claudio,* 59 N.Y.2d 556, 561 n.3 (1983). See *Commonwealth* v. *Stirk,* 392 Mass. 909, 913 (1984). See also *Rachlin* v. *United States,* 723 F.2d 1373, 1378 (8th Cir. 1983); *United States* v. *Zazzara,* 626 F.2d 135,

---

[5] The above discussion focuses on the constitutional arguments, but the defendant also has failed to show that he is entitled to relief on nonconstitutional grounds. Cf., e.g., *Commonwealth* v. *Sylvester,* 388 Mass. 749 (1983). He points to nothing in the record, including the proceedings relating to his motion for a new trial, that would support the subsidiary findings necessary for a judge to grant relief on nonconstitutional, "fairness" grounds.

138 (9th Cir. 1980); *Brown* v. *United States,* 551 F.2d 619, 620-621 (5th Cir. 1977). The principle of *Miranda* v. *Arizona,* 384 U.S. 436 (1966), has not been raised or argued, nor should it have been, in the circumstances of this case. "Apart from the defendant's right to counsel in exercise of his Miranda rights, he had no other constitutional right to counsel at the preliminary stage of this proceeding." *Commonwealth* v. *Stirk,* 392 Mass. 909, 913 (1984).

The defendant further argues that there was a conflict of interest and ineffective assistance during his trial. At all stages of the proceedings following his indictment, of course, the defendant did enjoy a constitutional right to effective, conflict-free assistance of counsel. "A defendant, however, may waive this right to an attorney 'unhindered by a conflict of interests.' " *Commonwealth* v. *Goldman,* 395 Mass. 495, 505, cert. denied, 474 U.S. 906 (1985), and cases cited. In this case, the defendant knowingly, intelligently, and unequivocally indicated his understanding of the circumstances regarding the possibility of a conflict of interest and his desire to continue to be represented by Mr. Elias. See *supra* note 2. The judge's examination of the defendant in this regard was as thorough and probing as reasonably can be required.

The defendant also argues that he should have been provided independent counsel at the March 12, 1984, hearing at which he waived his right to conflict-free counsel, and that the lack of independent counsel vitiates his purported waiver. Although we think that such a procedure is the better practice, see *Commonwealth* v. *Connor,* 381 Mass. 500, 505 n.5 (1980), we do not think that the judge's failure to provide independent counsel compels the conclusion that the defendant's waiver is invalid. Independent counsel might well be required prior to accepting a defendant's waiver of important constitutional rights in circumstances where there is reason to believe that independent legal advice is reasonably necessary in order to permit the defendant knowingly and intelligently to decide whether to waive or to exercise his rights. But in the circumstances of this case, the judge's thorough examination of the defendant on this matter, and the defendant's unequivocal decision to

continue representation by Mr. Elias, amply support the judge's ruling that the defendant's waiver of conflict-free counsel was knowingly and intelligently made.

Having disposed of the defendant's contention as to conflict of interest, we turn to his argument that Mr. Elias otherwise rendered ineffective assistance at trial. To succeed on such a claim, the defendant must show that his attorney's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," and that this shortcoming "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96-97 (1974), and cases cited. No such showing has been made.

The defendant criticizes Mr. Elias's trial strategy and performance generally, but focuses specifically on three actions by Mr. Elias, namely, his failure to object to the admission of the defendant's statement to the police and grand jury testimony, his asking the judge not to submit to the jury the issue of the voluntariness of these statements, and his introduction of evidence that Palaza had made a statement inculpating the defendant.[6] Viewed with the benefit of hindsight, these actions may appear inexpedient or counterproductive; they were, however, done advisedly and were not irrational decisions. The defendant, in his statement to the police and in his grand jury testimony, exculpated himself and laid the blame for the crimes of rape and murder on Palaza. It was arguably in the defendant's interest that the jury consider these statements. In seeking the admission of evidence that Palaza had made statements inculpating the defendant, Mr. Elias's hope was that the jury would find Palaza noncredible, and so tend to believe the defendant's story.[7]

---

[6] Mr. Elias obtained a ruling from the judge that the defendant could introduce, in their entirety, Palaza's statement to the police and his grand jury testimony. Mr. Elias subsequently did not introduce Palaza's statements, but only brought out through the testimony of witnesses for the Commonwealth that Palaza had made statements inculpating the defendant.

[7] To the judge's inquiry as to the defendant's theory in introducing Palaza's statements, Mr. Elias replied, "It is the defendant's opinion that the statements of Mr. Palaza are noncredible; that there have been three or four

Moreover, the record reveals that the trial judge carefully examined the defendant as to his understanding of the nature of his attorney's strategy in introducing Palaza's statement and in declining a jury instruction on voluntariness, and of the risks involved, and that the defendant both understood and acquiesced in these decisions.

2. *Joint venture jury instruction.* The defendant contends that the trial judge, in deciding to instruct the jury on the theory of joint venture, improperly considered evidence presented at Palaza's trial, at which the same judge presided. The defendant argues that the judge's consideration of such extra-record evidence denied him his rights to due process and to a fair trial. We disagree. First, it appears that the judge did not ground his ruling on this basis. In his words, such evidence was "probably not needed on this ruling." See *supra* note 4. More importantly, the judge's ruling was, at worst, correct, but for a different reason. "Because the nature of the evidence may have suggested to the jury the possibility that there was more than one assailant,[8] the judge was justified in giving a joint enterprise instruction. . . . The evidence was sufficient to show that the defendant was at least a participant, even if he was not the sole perpetrator, and that he possessed the state of mind required for guilt. Nothing further was required for conviction."

different ones made, each one significantly different than the one before where, when stacked up against his [the defendant's] consistently same statement given on three or four different occasions, it would be beneficial to him in having the jury decide which of the two is credible. He's of the opinion that they're going to believe one or the other, rather than disbelieve both."

[8] For example, Palaza, in his grand jury testimony admitted at trial at the defendant's request, stated that the defendant alone had raped and killed the victim, and that he, Palaza, had merely helped to dispose of the body. However, an expert on forensic dentistry testified that bite marks inflicted on the victim could not have been made by the defendant. The expert was unable to say whether the marks could have been made by Palaza, as Palaza's teeth had been physically altered "by a non-dentist" in a manner that precluded certainty in matching them with the bite marks. In addition, a pathologist testified that bruises on the victim's arms were "consistent with . . . something, hands, for example, of *one or more persons* just holding these areas, trying to restrain the decedent, and these are antemortem, before she died" (emphasis added).

*Commonwealth* v. *Dyer*, 389 Mass. 677, 683 (1983). That Palaza was acquitted does not insulate the defendant from being found guilty as a joint venturer. There is nothing inconsistent between one jury's finding that there was insufficient evidence to prove Palaza's guilt beyond a reasonable doubt, and another jury's finding, in a separate trial, that there was sufficient evidence to prove the defendant's guilt to that degree of certainty. See *Commonwealth* v. *Cerveny*, 387 Mass. 280, 285-286 (1982) (separate prosecution for conspiracy not barred by acquittal of sole coconspirator).

3. *G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E (1986 ed.), and decline to order a new trial or to direct the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*