## COMMONWEALTH vs. ARTHUR J. BELAND.

Bristol. November 9, 2001. - March 12, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Assistance of counsel, Argument by prosecutor, Voluntariness of statement, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Evidence,* Admissions and confessions. *Mental Impairment.*

There was no error in the denial of a criminal defendant's motion to suppress his statements to the police and the evidence seized in ensuing searches, where the judge's conclusions that the defendant's cognitive deficiencies, borderline intelligence, and history of mental illness did not render the Miranda warnings invalid or his statements involuntary were supported by the evidence [278-282]; where the delay between the defendant's arrest and his arraignment was not unreasonable and did not invalidate his Miranda waivers or render his statements involuntary [282-283]; and where the defendant's assertions that the police deprived him of sleep and food and failed to inform him of his right to use the telephone pursuant to G. L. c. 276, § 33A, were without merit [283-285].

A criminal defendant was not deprived of his constitutional right to effective assistance of counsel when his court-appointed attorney failed to telephone the police station to direct the police not to talk to the defendant before he could speak with counsel, where the defendant's constitutional rights to assistance of counsel did not attach before adversary criminal proceedings had commenced, and where there was no error in the conduct of counsel. [285-288]

At a criminal trial, the prosecutor's closing argument to the jury was proper, where the argument did not suggest to the jury that they judge the defendant based on his character, where the judge's instructions to the jury properly directed them to decide the case solely on the evidence and that the arguments of counsel were not evidence, and where the evidence against the defendant was strong. [288-290]

INDICTMENT found and returned in the Superior Court Department on August 10, 1994.

A pretrial motion to suppress evidence was heard by *Walter E. Steele,* J., and the case was heard by *Gordon L. Doerfer,* J.

*Murray A. Kohn,* Committee for Public Counsel Services (*Alan D. Campbell* with him) for the defendant.

*Sharon L. Sullivan-Puccini*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant, Arthur J. Beland, was charged in an indictment with the crime of murder in the first degree, resulting from the beating death of Mary Ann Soares. A jury convicted him of murder in the first degree by reason of extreme atrocity or cruelty. He appeals from his conviction asserting several errors: (1) his statements to police should have been suppressed because his waiver of his Miranda rights was not valid and his statements not voluntary in the totality of the circumstances; (2) he was deprived of his constitutional right to effective assistance of counsel because his court-appointed attorney failed to telephone the police station and request to speak to the defendant prior to his making incriminating statements; and (3) the prosecutor's closing remarks to the jury were improper and created a substantial likelihood of a miscarriage of justice. The defendant also requests that the court use its extraordinary power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict to prevent the substantial likelihood of a miscarriage of justice. For reasons stated below, we affirm the conviction and decline to use our power under G. L. c. 278, § 33E.

I. *Facts.*

The facts as the jury could have found them do not differ substantially from the findings of the motion judge and proceed as follows.[1] Just after 1 P.M., on July 27, 1994, emergency medical technicians (EMTs) responded to 142 High Street in Fall River, and met the defendant on the stairs leading to the third floor. He told the EMTs that he thought his girl friend (victim) was having a diabetic reaction. He then led them to the victim who was naked and unconscious in bed. The victim was cyanotic (blue-skinned as a result of insufficient oxygen in the blood), was laboring to breathe, and unresponsive to efforts to revive her.

In response to questions by the EMTs, the defendant stated that the victim was an insulin-dependant diabetic and that he

---

[1]The testimony before the judge on the motion to suppress consisted of the opinions of the psychological experts and the testimony of the police officers investigating the case.

could not remember the last time she had taken her medication. He also stated that the victim had not taken any drugs, but that she had consumed two glasses of wine the previous evening, and that her last meal was at about 8 P.M. He stated that she had been unresponsive for some time.

The EMTs prepared the victim for transportation and carried her out to the ambulance. The defendant assisted by carrying down some of the medical equipment. As the EMTs were placing the victim into the ambulance, they discovered that she was in cardiac arrest and immediately began cardiopulmonary resuscitation. The victim remained without a pulse or spontaneous respiration while en route to the hospital. The defendant appeared appropriately concerned and cried as he rode in the ambulance with the victim.

Doctors at Charlton Memorial Hospital treated the victim and were able to restore a feeble heartbeat with the aid of a pacemaker. A CAT scan and X-rays showed that the victim had a subdural hematoma and intercerebral bleeding. Dr. William Kasdon stated that "it would be very unusual . . . to have a cardiac arrest related exclusively to a very high or very low blood sugar." On review of the victim's medical records, Dr. Kasdon opined that her cardiac arrest resulted from her injuries. The victim later died as a result of her injuries during an emergency medical flight to Boston.

An autopsy of the victim, performed by Dr. Leonard Atkins, revealed numerous injuries consistent with trauma. Dr. Atkins concluded that the victim's cause of death was cerebral edema (swelling of the brain) and acute subdural hematomas, caused by blunt force trauma, and asphyxiation caused by strangulation. There were multiple severe head injuries, abrasions across the neck, and hemorrhage in the neck and in the lining of the airway. Dr. Atkins attributed the abrasions on the neck to the use of some kind of ligature (any object used to strangle or compress the neck).

While at the hospital, the defendant spoke with both an emergency room nurse and the hospital chaplain. He told them each that the victim had drunk a couple glasses of wine and had fallen, striking herself on the entertainment center. Both witnesses testified that the defendant responded appropriately to

questions and did not appear confused or under the influence of any substances.

Detectives Thomas Chace and Joseph Castro of the Fall River police department responded to Charlton Memorial Hospital shortly after the victim was admitted. After photographing the injuries sustained by the victim, the detectives went to the hospital's family room to speak to the defendant. The defendant left the hospital with the detectives, and the detectives recited the Miranda warnings from a printed card. The defendant said that he wanted to find out what really happened and that it was only a diabetic reaction, and stated that he understood his rights and wanted to speak with the detectives. He then got into an unmarked cruiser with the detectives and they proceeded to the defendant's apartment at 142 High Street. The detectives informed him that they wished to search his apartment in connection with their investigation, and he agreed and signed a consent to search form in the cruiser. They then proceeded to search the apartment.

The defendant told Detective Chace what happened during the previous night in the apartment. He said that, after consuming a couple of glasses of wine very quickly, the victim stumbled and fell a number of times striking her head, and eventually lost consciousness. Detective Chace asked the defendant if he struck the victim, and the defendant denied ever touching her, saying that it was just a diabetic reaction. Shortly after 4 P.M., they placed the defendant under arrest, collected evidence from the apartment including the bedding, which appeared to be blood stained, and then transported the defendant to the Fall River police station.

At approximately 4:23 P.M., Detectives Chace and Castro and State Trooper Jeff Pierce interviewed the defendant at the major crimes unit of the police station. Detective Chace again informed the defendant of his Miranda rights with a printed rights form. The defendant filled out and signed his name on the form indicating that he understood his rights and that he wished to speak with the police. He stated that he wanted to help the police find out what happened to the victim, that he never struck her, that she had banged her face on the entertainment center, fell backward into the door frame, and then fell forward into the apartment door.

Some time after 8:55 P.M., Detective Chace learned that the victim died from her injuries. The investigation then became a homicide investigation.

At about 3 A.M., on July 28, 1994, State Troopers John Hubbard, Pierce, and Detective Castro conducted another interview with the defendant. Trooper Hubbard again advised the defendant of his Miranda rights, and the defendant indicated that he understood them and was willing to answer questions. The defendant relayed the events of July 26. He stated that the victim prepared dinner for them, consisting of meat and potatoes, the defendant had two glasses of wine with dinner, and then had a third before going down to the second floor to use a common restroom. On his return, he observed the victim drinking a glass of wine, and she told him that she had consumed two other glasses while he was at the restroom. He said that she was standing near the love seat and fell backward, hitting her head on a picture frame on the wall. She then stood up and fell into the entertainment center. He said that she then got up and walked into the door frame leading into the kitchen and fell to the floor.

After further questioning, the defendant said that he and the victim were having an argument about a former boy friend before she became unconscious. He said that the argument escalated to a point where the victim attempted to strike him, but that he did not react. When asked whether he had struck the victim, the defendant first responded that he did not, but then said maybe he did and maybe he did not, he was unsure.

At approximately 4:30 A.M., after the interview, Detective Thomas Chace obtained another consent to search form from the defendant. Detectives Chace, Donald Forcier, and Michael Chace and Trooper Patricia Beehan returned to the apartment and photographed the apartment and looked for evidence. Police seized a picture frame with broken glass, various blood-stained articles of clothing and bedding from inside the closet, and a wire television antenna found in the closet, near the hamper. After returning to the police station, the detectives took the defendant's clothing, which was blood stained, and a ring he

was wearing, and obtained a third consent to search form so that they could get fresh clothes for him from his apartment.[2]

At approximately 9:25 A.M. on July 28, 1994, after learning that the defendant was in custody and awaiting arraignment on a charge of murder, the murder assignment coordinator for the Committee for Public Counsel Services assigned an attorney to the defendant's case. The attorney said that he would arrive at the court house by 11:30 A.M. He did not telephone the police station to request to speak to the defendant.

At approximately 9:40 A.M., on July 28, 1994, Detective Andrew Wilson was escorting the defendant from the identification bureau to the holding cell when the defendant said that he wished to speak to Detective Castro. Detective Wilson brought the defendant back up to the third floor of the police station and located Detective Castro. Detective Castro asked the defendant what he wanted. The defendant said that he wanted to speak to him from his "heart and soul." Detective Castro and his supervisor, Detective Sergeant Michael Place, read the defendant the Miranda warnings from a printed form, which the defendant signed. The defendant then said that he remembered striking the victim once, but then did not remember what happened after that, saying that he "lost it and [possibly] blacked out."

II. *Motion to Suppress.*

The defendant claims that the judge erred in denying his motion to suppress statements he made to police and the evidence seized in ensuing searches as fruit of the poisonous tree. The defendant argues that the judge failed properly to consider a confluence of factors the combination of which rendered his Miranda waivers invalid and his statements involuntary. He maintains that the judge failed to consider the delay between his

---

[2]The Massachusetts State police crime laboratory determined that stains found on the defendant's shirt, a slip, pull-on pants, pillow cases, a sheet, a sheet-like cover, a white T-shirt, and light blue shorts were composed of blood. Occult, or nonvisible, blood was discovered on a plastic antenna wire, the defendant's ring, and in the defendant's fingernail scrapings. The fingernail scrapings were taken from the defendant on the morning of July 28, 1994. A State serologist determined that blood found on the defendant's shirt and pants, the pillow cases, the sheet-like cover, the white T-shirt, the light blue shorts, the white slip, the panties, and the blue pants was consistent with the victim's blood type and inconsistent with the defendant's blood type.

arrest and arraignment, his lack of sleep and food, his cognitive deficiencies and borderline intelligence, and his history of mental illness. We find no error in the judge's denial of the defendant's motion and, therefore, reject the defendant's arguments.

In reviewing the judge's denial of a motion to suppress we grant substantial deference to his conclusions and will not upset his subsidiary findings if they are warranted by the evidence. *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 364 (1997), and cases cited. We, however, conduct an independent review of the judge's application of the law. *Id.* The Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant voluntarily, knowingly, and intelligently waved his Miranda rights in the totality of the circumstances. See *Commonwealth* v. *Jackson*, 432 Mass. 82, 85 (2000). The Commonwealth bears the same burden in proving the defendant's statements were made voluntarily. *Id.*, and cases cited.

The validity of a defendant's Miranda waiver and the voluntariness of his statements are distinct inquiries, but the totality of the circumstances test applied in each is the same. *Id.* at 85-86, citing *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995). "Relevant factors to consider include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or police), and the details of the interrogation, including the recitation of Miranda warnings.' " *Id.* at 86, quoting *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). The judge's findings are supported by the evidence and his conclusions as to the validity of the defendant's waiver and the voluntariness of his statements will not be upset here.

A. *Expert testimony.* The Commonwealth and the defendant both presented expert testimony on the defendant's mental deficiencies and prior history of mental illness at the motion to suppress hearing and at trial.[3] The defendant's witness, Dr. Janice R. Baldwin, reviewed two reports written by Dr. Paul G.

---

[3]Based on the judge's finding that the defendant's expert witness was unavailable and on the Commonwealth's stipulation, the defendant's expert

Nestor, the Commonwealth's expert, the defendant's clinical mental health records, and reports relating to the incident, as well as interviewing the defendant. When asked to assume the defendant had been in police custody for approximately eighteen hours, that during approximately the last thirty-six to forty hours the defendant had had little to eat and little sleep, and in view of her own assessment of his mental condition, Dr. Baldwin opined that there was "reason to believe that the statements that [the defendant] offered were not made freely or intelligently with a rational degree of understanding of the circumstances."

The Commonwealth presented the testimony of Dr. Paul G. Nestor, who conducted an examination of the defendant for both his competency to stand trial and his criminal responsibility at the time of the incident. Dr. Nestor supervised neuropsychological testing conducted on the defendant over three days, consulted with the clinical team responsible for the defendant's treatment while at Bridgewater State Hospital, and reviewed police reports and witness statements concerning the incident. Dr. Nestor examined the defendant's history of prior psychiatric hospitalizations, but found no record of hospitalizations after 1989, and the defendant reported that he had not required psychiatric treatment over the past several years. Dr. Nestor further stated that the defendant did not exhibit any signs of mental illness. The defendant did, however, suffer from some cognitive deficits, testing in the borderline range for intelligence, but his deficiencies were not severe enough to qualify as a mental defect. Dr. Nestor also opined that the defendant's test scores underestimated the defendant's native ability because they were influenced by his low level of education. The defendant did not have any difficulty understanding the circumstances, or why he was at the hospital. Dr. Nestor also stated that the defendant was not unduly impressionable or naive. Dr. Nestor found the defendant both competent to stand trial and criminally responsible at the time of the incident. Dr. Nestor reported that the defendant said he was doing "pretty good" on July 27 and 28 of 1994.

1. *Cognitive deficiencies and borderline intelligence.* The

witness's testimony was admitted at trial by reading the transcript of her testimony at the motion to suppress hearing.

defendant argues that the judge failed to consider evidence of the defendant's cognitive deficiencies and borderline intelligence in deciding the motion to suppress. The judge considered evidence of the defendant's low intelligence and we decline to replace the judge's finding with our own. *Commonwealth* v. *Prater*, 420 Mass. 569, 578 (1995). "The police, and ultimately judges, must give special attention to whether a person of low intelligence waived Miranda rights and voluntarily and knowingly made a statement to the police . . . . Circumstances and techniques of custodial interrogation which pass constitutional muster when applied to an adult of normal intelligence may not be constitutionally tolerable when applied to one who is mentally deficient." (citations omitted.) *Commonwealth* v. *Hartford*, 425 Mass. 378, 381 (1997). People with low intelligence can, however, waive their rights. See *Commonwealth* v. *Jackson*, *supra* at 86; *Commonwealth* v. *Hartford*, *supra*, and cases cited; *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 366-367 (1997). "[T]he judge's decision to admit the defendant's statements renders the judge's conclusions as to voluntariness 'clearly evident from the record,'" *Commonwealth* v. *Parham*, 390 Mass. 833, 838 (1984), quoting *Commonwealth* v. *Brady*, 380 Mass. 44, 52 (1980), and the judge's conclusions were not erroneous as a matter of law.

The judge heard extensive testimony from experts on behalf of both the defendant and the Commonwealth. The judge was free to reject the testimony of the defendant's expert and to credit the testimony of Dr. Nestor, who testified that the defendant suffered from mental deficiencies, but did not suffer from any mental defect. See *Commonwealth* v. *Jackson, supra*; *Commonwealth* v. *Prater, supra* at 574-575. He also testified that the defendant was not unusually naive or susceptible to influence. The judge was also free to rely on the testimony of the police officers, all of whom stated that the defendant was coherent and appropriate under the circumstances. The judge found that the defendant's statements were articulate and coherent. Furthermore, the defendant gave a completely exculpatory explanation of events to police officers, indicating an awareness of the consequences of waiving his rights and speaking to the police. Cf. *Commonwealth* v. *Jackson, supra* at

87. The judge's conclusions that the defendant's mental deficiencies did not render his Miranda waiver invalid or his statements involuntary were supported by the evidence, therefore, we decline to disturb them.

2. *History of mental illness.* The defendant further claims that the motion judge failed to consider his history of mental illness and, thus, erred in deciding the motion to suppress. Although the judge did not make extensive findings with respect to the defendant's history of mental illness, his conclusion that the defendant did not produce credible evidence to support the allegations that his mental state affected his ability validly to waive his Miranda rights and make voluntary statements renders his conclusions clearly evident from the record. See *Commonwealth* v. *Parham, supra* at 838. Dr. Nestor disagreed with the defendant's prior diagnoses of schizophrenia and psychosis. He believed the defendant's hospitalizations were caused by marital problems and that his symptoms often disappeared within days and seemed to be directly related to his mood. The judge was free to credit the Commonwealth's expert's testimony that the defendant did not suffer from a mental defect, his conclusions were warranted by the evidence, and we decline to supplant them with our own. See *Commonwealth* v. *Jackson, supra* at 86; *Commonwealth* v. *Prater, supra* 574-575.

B. *Delay between arrest and arraignment.* The defendant argues that the police improperly delayed his arraignment and, as a result, his statements should have been suppressed.[4] The defendant points to *Commonwealth* v. *Rosario,* 422 Mass. 48 (1996), in which we established a prospective bright-line rule barring admission of any statement made beyond six hours after a defendant's arrest. *Id.* at 56. The defendant acknowledges that the *Rosario* case was decided after the case at bar, but nevertheless argues that the length of the delay should be deemed unreasonable in light of the *Rosario* considerations. We do not agree.

The six-hour safe harbor created in *Commonwealth* v. *Rosa-*

---

[4]The defendant conceded at the hearing on the motion to suppress that he was not claiming any "active misconduct by police." To the extent that the defendant now suggests the police intentionally delayed the arraignment, and that the judge's memorandum failed to address this point, it seems that the defendant's concession should resolve the issue. We, however, address the defendant's argument.

*rio, supra,* does not control our analysis. See *Commonwealth* v. *Hunter,* 426 Mass. 715, 720 n.2 (1998); *Commonwealth* v. *Fryar,* 425 Mass. 237, 250 n.9, cert. denied, 522 U.S. 1033 (1997). Police have a duty to bring an arrested person before a court for arraignment as soon as reasonably practicable. *Commonwealth* v. *Hunter, supra* at 720. At the time of the defendant's suppression hearing, the reasonableness of any delay between arrest and arraignment was determined in light of the circumstances. *Id.* The circumstances considered include the giving of Miranda warnings, the passage of time between arrest and confession, and the purpose and flagrancy of the police conduct. *Id.* at 720-721.

Applying this analysis, we have found that in cases where an arrest was effected after court had closed, arraignment of the defendant on the following day was reasonable. *Id.* at 721. Here, the defendant was arrested shortly after 4 P.M. and arraigned at approximately 11:30 the following morning. There is no indication that the court would have scheduled an arraignment at such a late hour on the evening of the defendant's arrest and the elapsed time between the defendant's arrest and arraignment is roughly equal to what we have held to be reasonable in other cases. *Id.,* citing *Commonwealth* v. *Rosario, supra* at 49-50 (elapsed time of twenty hours reasonable). Moreover, the defendant was given and acknowledged his Miranda rights on four separate occasions, prior to each of his statements. Finally, there is no indication that the police delayed arraignment improperly to apply pressure to the defendant so as to yield a confession. The delay was not unreasonable and did not invalidate the defendant's Miranda waivers or render his statements involuntary. See *Commonwealth* v. *Hunter, supra* at 720 (defendant arrested at 2:55 P.M. and arraigned after 10 following morning reasonable).

C. *Lack of sleep and food.* The defendant also argues that the judge failed properly to consider the defendant's sleep deprivation and lack of food in deciding his motion to suppress. The defendant's assertions are devoid of merit and are clearly refuted by the judge's findings and by the record. We, therefore, reject his argument.

The judge expressly found that the defendant drank sodas

during both the interviews at 4:23 P.M. and at 3 A.M. The judge also found that the defendant ate a meal consisting of a hamburger, french-fries, and milk at approximately 5:30 P.M. In addition, the record indicates that the defendant consumed a meal of meat, potatoes, cucumbers, and wine on the night of the incident. There is no basis on which to conclude that the defendant was deprived of food in order to coerce his statements or that his Miranda waiver should be deemed invalid or his statements involuntary.

The record also indicates, and the judge expressly found, that the defendant had been awakened by police in the holding cell prior to an interview at 3 A.M.[5] This refutes the defendant's claim that he was deprived of sleep. The defendant was left alone in the holding cell from approximately 5 P.M. on July 27 until approximately 3 A.M. on July 28. After the 3 A.M. interview on July 28, ending at approximately 4:15 A.M., the defendant signed a consent to search form and was returned to the holding cell where he remained undisturbed until approximately 9:30 A.M. The defendant had ample opportunity to rest, and the judge specifically found that the defendant did sleep. There is no basis on which to conclude the defendant suffered from a lack of sleep so as to render his Miranda waiver invalid and his statements involuntary.

The defendant's argument that this court should find that the judge failed to consider the above factors in deciding the motion to suppress and that the combination of these factors should lead us to find the judge's conclusions were erroneous is rejected. The judge properly concluded that the defendant validly waived his Miranda rights and his statements were voluntary.

D. *Right to use the telephone.* The defendant further alleges that his statements to police should be suppressed because there

---

[5]We view the practice of off-hour interrogation with disfavor, especially when there is no apparent necessity to interrupt a suspect's sleep in the middle of the night or at early morning hours. See *Commonwealth* v. *Hunter*, 426 Mass. 715, 723 n.3 (1998). We, however, do not find that this sole circumstance is enough to be suggestive of coercion. The record indicates that the defendant had the opportunity to rest prior to the early morning questioning, that new information regarding the death of the victim made reinterrogation appropriate, and there is no indication that the defendant was not alert. *Id.*

is no evidence the police informed him of his right to use the telephone pursuant to G. L. c. 276, § 33A. This claim is without merit. Detectives Chace and Castro informed the defendant of his Miranda rights by way of a printed rights form prior to questioning the defendant at the police station, which the defendant read and signed. The Miranda rights form was admitted in evidence and clearly sets forth the defendant's right to use the telephone. See *Commonwealth* v. *Painten*, 429 Mass. 536, 542 (1999).

III. *Ineffective Assistance of Counsel.*

The defendant asserts that he was deprived of his constitutional right to effective assistance of counsel when his court-appointed attorney failed to telephone the police station to direct the police not to talk to the defendant before he could speak with counsel. Claims of ineffective assistance of counsel raised on a defendant's direct appeal from a conviction of murder in the first degree benefit from the more favorable standard of review under G. L. c. 278, § 33E. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 353-354 (2001), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). We examine whether the attorney erred and whether such error was likely to influence a jury's verdict. *Id.* Because we conclude that the defendant's constitutional rights to assistance of counsel had not attached and because we find no error in the conduct of his attorney, we decline to accept the defendant's argument.

The right to the assistance of an attorney attaches for a criminal defendant when adversary proceedings commence. This court has held, "[t]here is no authority for the proposition that the right to counsel under the Sixth and Fourteenth Amendments to the Constitution of the United States or under art. 12 of the Massachusetts Declaration of Rights arises prior to arraignment, even though a criminal complaint and an arrest warrant have issued." *Commonwealth* v. *Ortiz*, 422 Mass. 64, 67 n.1 (1996), citing *Commonwealth* v. *Jones*, 403 Mass. 279, 286 (1988). See *Commonwealth* v. *Soffen*, 377 Mass. 433, 436 (1979), and cases cited ("It is well settled that this right attaches to that stage of the criminal process during which the defendant is deciding how to plead"). At the time of the defendant's 9:45 A.M. interrogation, he did not have any Sixth

Amendment or art. 12 right to the assistance of counsel, and thus, could not have been deprived of the effective assistance of counsel by the court appointed attorney's failure to telephone the police station. See *Commonwealth* v. *Jones, supra* (declining to address whether attorney representing suspect at interrogation had conflict of interest because "the defendant had no constitutional right to counsel at the time of his interrogation"); *Commonwealth* v. *Stirk*, 392 Mass. 909, 913 (1984) ("Apart from the defendant's right to counsel in exercise of his Miranda rights, he had no other constitutional right to counsel at the [interrogation]").

The defendant further argues that our decision in *Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000), creates a limited right to counsel prior to the imposition of adversary proceedings against a criminal defendant.[6] We reject this argument.

In that case, the police were interviewing the defendant when they refused the defendant's father's requests to see him. *Id.* at 851-852. The defendant's family then retained an attorney who telephoned the police station and requested to speak with the defendant. *Id.* at 852. When his request was denied, he instructed police to discontinue interrogations until he could get to the police station and consult with his client. *Id.* The police officers did not inform the defendant that his attorney had telephoned and continued with interrogations. *Id.* Later, and while interrogations were still proceeding, the defendant's father and another attorney arrived at the police station and requested to speak with the defendant. *Id.* at 852-853. Police did not inform the defendant that his attorney was present and wanted

---

[6]*Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000), was decided several years after the defendant was arrested and his counsel appointed; thus, its holding is not specifically applicable to this case. We address the defendant's claims because *Commonwealth* v. *Mavredakis, supra*, descended from a series of cases in Massachusetts holding that a criminal defendant must be informed of efforts of counsel at making contact to effectuate the protections afforded defendants under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). See *Commonwealth* v. *Sherman*, 389 Mass. 287, 288 (1983); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691-692 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *McKenna*, 355 Mass. 313, 317-320 (1969). Those decisions did not state, however, whether they were based on the Federal or the State Constitution.

to speak with him until over one half-hour later, and after the defendant had given an incriminating statement. *Id.* at 853.

We considered whether art. 12 provides greater protection for criminal defendants than the Federal Constitution, in the wake of *Moran* v. *Burbine*, 475 U.S. 412, 422 (1986) (holding Fifth Amendment does not require that police inform defendant of attorney's efforts to make contact because "[e]vents occurring outside the presence of the suspect and entirely unknown to him surely . . . have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right").[7] *Commonwealth* v. *Mavredakis*, *supra* at 856, quoting *Moran* v. *Burbine*, *supra.* We concluded that it does, noting that "[t]he history of art. 12 and our prior interpretations of its self-incrimination provisions . . . lead to the conclusion that art. 12 provides greater protection than the Federal Constitution does." *Commonwealth* v. *Mavredakis*, *supra* at 859. See *Commonwealth* v. *Cryer*, 426 Mass. 562, 568 (1998). Focusing on a difference between "the abstract right to speak with an attorney mentioned in the Miranda warnings, and a concrete opportunity to meet 'with an identifiable attorney actually able to provide at least initial assistance and advice,'" we reasoned that "the duty to inform a suspect of an attorney's efforts to render assistance is necessary to actualize the abstract rights listed in *Miranda* v. *Arizona*, 384 U.S. 436 (1966)." *Commonwealth* v. *Mavredakis*, *supra* at 859-860, quoting *State* v. *Haynes*, 288 Or. 59, 72 (1979), cert. denied, 446 U.S. 945 (1980). We established a bright-line rule, providing that police must stop questioning and inform a suspect immediately of attempts of an attorney identifying himself or herself as counsel acting on the suspect's behalf to contact the suspect. *Id.* at 861. If the suspect accepts the attorney's assistance, police must suspend questioning until the suspect is afforded an opportunity to confer with the attorney either in person or by telephone. *Id.* The consequence of failing to inform a suspect of an attorney's efforts to make contact is to render "any waiver of rights that has been given . . . 'inoperative' for further admissions." *Id.*, citing *Commonwealth* v. *McKenna*, 355 Mass. 313, 324 (1969).

---

[7] The Supreme Court's decision in *Moran* v. *Burbine*, 475 U.S. 412 (1986), is dispositive of the defendant's claims under the Federal Constitution.

Nowhere in our decision in *Commonwealth* v. *Mavredakis*, *supra*, did we create a limited right to the assistance of counsel prior to the imposition of adversary criminal proceedings. Our holding was limited to analysis of the reach of the self-incrimination provisions in art. 12, and did not expand the rights of criminal defendants under that clause to include the assistance of counsel. We expressly stated that a duty to inform was needed to effectuate "the abstract rights listed" in *Miranda* v. *Arizona*, *supra*. *Id*. at 860. The right to the assistance of counsel under the Sixth Amendment is distinct from the right to have an attorney present during custodial interrogation. *McNeil* v. *Wisconsin*, 501 U.S. 171 (1991).

Moreover, the defendant asks the court to find that, because *Commonwealth* v. *Mavredakis*, *supra*, imposes a duty on police officers to inform suspects of the efforts of attorneys to make contact, an affirmative duty exists on the part of attorneys to call and direct police to halt questioning of their clients in order to provide an opportunity for consultation. We decline to do so. The rule we established in *Commonwealth* v. *Mavredakis*, *supra*, is designed to effectuate the protections against self-incrimination afforded to suspects under art. 12. The knowledge of a concrete offer of assistance may cause a suspect to assert his or her Miranda rights, and the failure of police to inform a suspect of such an offer bears on the validity of any waiver of those rights. It does not follow from a rule effectuating Miranda rights that attorneys have an affirmative duty to make contact with their criminal clients so as to act as catalysts for the invocation of those rights. The principal responsibility for invoking the protections guaranteed by *Miranda* v. *Arizona*, *supra*, and art. 12 rests squarely in the hands of criminal defendants. See *Commonwealth* v. *Vao Sok*, 435 Mass. 743 (2002).

IV. *Prosecutor's Closing*.

The defendant claims that the prosecutor's closing argument to the jury was improper and created a substantial likelihood of a miscarriage of justice. The defendant points specifically to the prosecutor's statements, "[I]t is not easy to judge another human being, but you have taken that task upon yourselves. I want you to feel honored to have served as jurors. And I'm sure you will." We conclude that the prosecutor's statements were not improper and did not deprive the defendant of a fair trial.

There was no objection to the statement when it was made; therefore, we decide whether the error, if any, created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Degro*, 432 Mass. 319, 329 (2000). Additionally, "[t]he fact that the defendant did not object, '[a]lthough not dispositive of the issue . . . is some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.' " *Commonwealth* v. *Sanchez*, 405 Mass. 369, 375 (1989), quoting *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). We also analyze the prosecutor's remarks in view of the entire argument, the judge's instructions to the jury, and the evidence presented at trial. See *Commonwealth* v. *Mello*, 420 Mass. 375, 380 (1995).

When viewing the prosecutor's summation in the larger context, set forth in the margin,[8] he does not appear improperly to suggest to the jury to judge the defendant based on his character. The prosecutor seems merely to have been thanking the jury for its service in the case. " '[E]nthusiastic rhetoric, strong advocacy, and excusable hyperbole' are not grounds for reversal." *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998), quoting *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997).

Additionally, the judge's instructions properly directed the jury that it was their job to decide the case solely on the evidence and that the arguments of counsel were not evidence. He also instructed the jury to determine the facts "without prejudice, without fear and without favor, and solely from a fair consideration of the evidence."

Finally, the evidence against the defendant was strong. The victim's death resulted from cerebral edema and acute subdural hematomas as a consequence of blunt force head trauma and asphyxiation caused by strangulation. The victim's blood type

---

[8]The prosecutor's remarks taken within their context were as follows: "Extreme atrocity. Look at the nature of the injuries, the use of the instrument. First-degree murder. Killing with malice. I ask you to come back with a first-degree murder verdict. I want to thank you for your time. It's been my honor to present this case on behalf of the Commonwealth. I want to thank you in advance for your verdict. You have been attentive this whole trial. Your work, your real work is about to begin, and it is not easy to judge another human being but you have taken that task upon yourselves. I want you to feel honored to have served as jurors. And I'm sure you will. Thank you."

was found on the defendant's clothes and clothing and bedding found in the apartment. Occult blood was discovered on the defendant's ring, an antenna wire, and in the defendant's fingernail scrapings. The defendant initially blamed the victim's injuries on a diabetic reaction before admitting that he hit her following an argument about a former boy friend. The prosecutor's statements did not cross the line of what we perceive to be proper advocacy, and did not create a substantial likelihood of a miscarriage of justice.

V. *G. L. c. 278, § 33E, Relief.*

The defendant requests that we order a new trial or reduce the degree of guilt according to G. L. c. 278, § 33E. We have reviewed the entire record and decline to exercise our power.

*Judgment affirmed.*