COMMONWEALTH *vs.* DEAN T. WALLEN. No. 92-P-530. September 16, 1993. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver. Homicide. Malice. Evidence,* State of mind, Cross-examination.

The defendant appeals from his conviction of murder in the second degree following a trial in the Superior Court on an indictment charging him with the murder in the first degree of Carlos Perez on January 18, 1990. He principally claims evidentiary errors and error in the denial of his motions for suppression of statements made to the police and for a required finding of not guilty. We affirm.

1. *The motion to suppress statements.* Although a motion judge ordered suppression of the defendant's statements made to the police after 4:45 A.M. on January 19, 1990, because the "totality of the circumstances of his interrogation by the police had changed," he permitted statements made before that time to stand. The defendant sought to have his statements made between 2:10 A.M. and 4:45 A.M. also suppressed, on the grounds that

his mental retardation and intoxication rendered them involuntary, and because he was psychologically coerced by the police who subjected him to lengthy questioning, thus overbearing his will. He also claimed these factors, principally his limited mental ability, rendered his purported waiver of his *Miranda v. Arizona*, 384 U.S. 436 (1966), rights invalid.

The motion judge found, after a hearing, that the defendant agreed to give the police, who arrived at the homicide scene at approximately 11:20 P.M. on January 18, 1990, additional details of what he saw prior to the victim's stabbing. He claimed to have seen the victim talking with a man near the crime scene and later to have found the victim lying on the ground. Lawrence Scott, whom the defendant had enlisted to aid the victim, also agreed to go to the police station. They were interviewed separately. Beginning at 11:55 P.M., the defendant gave a detailed statement which he signed approximately ninety minutes later, after it had been reduced to typewritten form. The judge found the defendant was not then in custody, not restrained in any way, and was not given any Miranda warnings. As a result of differences between statements made by the defendant and Scott, the police decided to interview the defendant again at approximately 1:45 A.M. Finding substantial changes from his earlier statement, the officers advised the defendant of his Miranda rights at 2:10 A.M. He agreed to continue to talk to the police. Following the officers' observation of what they suspected was blood on his boots, the defendant agreed to have his clothing and person tested and signed a consent form after being advised of his rights. At police request, he drew a diagram of the scene. Soon after 3:00 A.M., he was informed that his hands tested positive for presence of blood and that "he could not have gotten blood on his hands if the victim had been injured in the manner [he] described. . . ." The defendant was again advised of his Miranda rights and agreed to continue to talk with the police. He gave an additional statement, including information that he had taken medication for a toothache some sixteen hours earlier and that he was mentally retarded. Several questions were then asked by the police to determine whether the defendant understood his rights. His responses were "good, clear and exact." "After satisfying themselves that [the defendant] was able to understand his rights," the officers allowed him to complete another statement, which was reduced to typewritten form and which he read and signed at about 4:45 A.M. About five minutes later, an officer returned to challenge the manner in which the defendant indicated the victim's wounds were inflicted, but the interview became confrontational and was terminated at about 5:15 A.M., when the defendant was arrested and charged with the victim's murder.

The judge properly allowed the suppression of the defendant's oral accounts made after his second typewritten statement and properly denied the motion to suppress that statement and the statements preceding it. There is no indication that the defendant's presence at the police station was anything but voluntary or that the initial procedures employed by the

police were other than proper attempts at gathering information from a willing witness who was not in custody. No Miranda warnings were required in these circumstances. *Commonwealth* v. *Bryant*, 390 Mass. 729, 736-737, 738 (1984). The defendant asserts, without challenging the judge's subsidiary findings, that his intoxication and mental retardation, together with allegedly coercive circumstances of his questioning, amounted to an overbearing of his will rendering involuntary both his statements and the waiver of his Miranda rights.

Based on the detailed observations of an officer who appeared at the scene and another who participated in the questioning of the defendant, the judge properly could conclude that he was not under the influence of alcohol or drugs. Nothing appears from the record to indicate that the defendant was unable to understand any of the procedures. While the judge found that the defendant has an I.Q. between sixty and seventy, attained only third or fourth grade reading and writing levels, and is able to recognize few words of more than three syllables, he also found he could read newspapers and write letters. "[A]n adult with a diminished or subnormal mental capacity may make an effective waiver of his rights and render a voluntary, knowing and admissible confession." *Commonwealth* v. *Daniels*, 366 Mass. 601, 606 (1975), and authorities cited. See *Commonwealth* v. *Medeiros*, 395 Mass. 336, 347 (1985). The judge's findings reveal that he used the "special care" required, see *Haley* v. *Ohio*, 332 U.S. 596, 599 (1948), in analyzing both the "characteristics" of the defendant and the "details of the interrogation." See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973). The defendant's statements reflected various efforts to exculpate himself, and the record does not support the claim that his will was broken. See *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988). Also, in the circumstances found by the judge, he correctly concluded that the defendant understood his rights and that he voluntarily, knowingly, and intelligently waived them. See *Commonwealth* v. *Medeiros*, *supra* at 347-348; *Commonwealth* v. *Libran*, 405 Mass. 634, 638-639 (1989). The judge properly considered the separate questions of the validity of the defendant's waiver of his rights and the voluntariness of his statements given to the police. *Commonwealth* v. *Garcia*, 379 Mass. 422, 428 (1980). His subsidiary findings are amply supported by the evidence, and there is no clear error. See *Commonwealth* v. *Harmon*, 410 Mass. 425, 430-432 (1991).

2. *The motion for a required finding of not guilty.* Broadly alleging the Commonwealth's case depended upon "unreasonable inferences, conjecture, and surmise," the defendant claims there was no competent evidence to substantiate the theory that he possessed a knife on the night the victim was stabbed, or that he stabbed him, and that the testimony, including that of a witness stating she had seen him with a knife on a previous occasion, was insufficient to sustain the Commonwealth's case. Viewed in a light most favorable to the Commonwealth, the evidence was sufficient to

withstand the motion initially made at the close of the Commonwealth's evidence, *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), and there is no indication that the case later deteriorated, see *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 & n.1 (1976). The defendant does not argue the sufficiency of the evidence that he acted with malice aforethought. That argument, therefore, is waived. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). In any event, malice may be inferred from the intentional use of a deadly weapon, see *Commonwealth* v. *Lowe*, 391 Mass. 97, 107-108, cert. denied, 469 U.S. 840 (1984). The evidence most favorable to the Commonwealth includes the eyewitness's testimony that she saw the defendant and the victim arguing, that the defendant struck the victim in the upper part of his body, causing him to stumble back, then jabbed him with a broomstick which he held with both hands, after which the victim fell to the ground. Evidence of blood was found on the defendant's hands and the broomstick. Although the victim died as the result of a stab wound in the left upper chest, no knife was seen or recovered. Droplets of blood were observed, however, trailing from the scene towards a nearby canal. Another witness testified she had seen the defendant carrying a knife shortly before the murder, and thus there is sufficient evidence to support a reasonable inference that he had the means to stab the victim. See *Commonwealth* v. *Watkins*, 375 Mass. 472, 491 (1978); *Commonwealth* v. *Toro*, 395 Mass. 354, 356-357 (1985). The direct and circumstantial evidence was sufficient to permit the jury to convict the defendant of second degree murder. See *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 305 & n.3 (1992). See also *Commonwealth* v. *Porter*, 384 Mass. 647, 653-654 (1981); *Commonwealth* v. *Rojas*, 388 Mass. 626, 630 (1983); *Commonwealth* v. *Doucette*, 408 Mass. 454, 461-462 (1990).

3. *Evidentiary errors.* The defendant first claims that the admission of certain hearsay testimony, which was not objected to, was highly prejudicial. A witness told of warning the defendant he might get hurt by bragging about being "tough." He responded by showing her a knife and said: "Not as long as I have this." Evidence that the defendant possessed a knife was admissible. See *Commonwealth* v. *Watkins*, *supra* at 491; *Commonwealth* v. *Toro*, *supra* at 356. The defendant's verbal response was essentially a declaration revealing his state of mind, similar to his act of showing the knife. See *Commonwealth* v. *Trefethen*, 157 Mass. 180, 188 (1892); *Commonwealth* v. *DelValle*, 351 Mass. 489, 492 (1966). In any event, in these circumstances, his verbal response was not so prejudicial as to create a substantial risk of a miscarriage of justice.

There is no merit in the defendant's claim that the testimony of a witness that the defendant was a "punk and a habitual liar," coupled with testimony of police officers that there were "discrepancies" in the defendant's statements, that he "chang[ed] his story," gave a "different version," "a story," or lied during interrogation, cumulatively created a substantial risk of a miscarriage of justice. The witness's remark was elicited by de-

fense counsel on cross-examination and cannot now be challenged. On three occasions the defendant did not object to the use of "discrepancy" or "inconsistencies," and there was no objection to the use of "story" on another. Defense counsel in cross-examination also used the terms "conflict" and "discrepancy." The defendant's objections to the characterizations of "changes" and "inconsistent" statements on two other occasions were sustained. Moreover, the judge forcefully instructed the jury on three occasions, twice to strike and disregard the word "story" and also that it was for the jury to find whether there were "inconsistencies." In view of the defendant's statement "that the stories I had given are lies" and the judge's forceful instructions, see *Commonwealth* v. *Gordon*, 356 Mass. 598, 604 (1970); *Commonwealth* v. *Gagnon*, 408 Mass. 185, 191-192 (1990), it does not appear that there was a cumulative, substantial risk of a miscarriage of justice arising from any characterization of the facts by the police.

*Judgment affirmed.*

The case was submitted on briefs.

*Lawrence R. Glynn* for the defendant.

*Thomas F. Reilly*, District Attorney, & *Barbara F. Berenson*, Assistant District Attorney, for the Commonwealth.