## Commonwealth *vs.* Curtis Jackson.

Hampden. April 7, 2000. - July 10, 2000.

Present: Marshall, C.J., Abrams, Ireland, Spina, & Cowin, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Waiver, Required finding, Capital case. *Homicide. Burglary. Felony-Murder Rule. Robbery.*

In a criminal case, the judge's findings on the defendant's motion to suppress his statements to police supported his conclusion that the defendant voluntarily waived his Miranda rights and voluntarily gave statements to the police, and the defendant's asserted low intelligence quotient alone did not require suppression of the statements. [85-87]

At a murder trial, evidence that the victim was killed by manual strangulation in the course of a struggle was adequate evidence of premeditation and the jury were not required to believe the defendant's evidence that he did not have the mental capacity to form an intent to kill. [87-88]

An unarmed burglary in which a person lawfully in a dwelling is actually assaulted (G. L. c. 266, § 14) is a felony inherently dangerous to human life for purposes of first degree felony-murder. [88-90]

At a murder trial, the jury were properly instructed that to convict the defendant of first degree felony-murder based on an unarmed robbery the Commonwealth must prove beyond a reasonable doubt that the defendant committed the robbery with conscious disregard of risk to human life [90], and the evidence was sufficient to warrant the defendant's conviction on that theory [90-91].

INDICTMENTS found and returned in the Superior Court Department on December 31, 1996.

A pretrial motion to suppress evidence was heard by *Daniel A. Ford,* J., and the cases were tried before him.

*Stanley W. Norkunas* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on theories of deliberate premeditation and felony-

murder.[1] He was also convicted of burglary. On appeal he claims error in the denial of his motion to suppress statements he made to police, and the denial of his motion for required findings of not guilty. We affirm the convictions and decline to exercise our powers under G. L. c. 278, § 33E.

1. *Facts.* The jury could have found the following facts. Mary Paviol's body was discovered by police on November 10, 1996, shortly after friends reported that she failed to appear at work for two days. She was lying near a pool of dried blood in the bedroom of her apartment at 103 Spring Street, Springfield. There were signs of a struggle in her living room. A wig and a pair of eyeglasses lay on the floor surrounded by her blood. A wastebasket, a lamp, and a chair had been upended. A blood smear extended from the back door, through the living room, and into the bedroom, as if something had been dragged through blood. A television, a microwave, and jewelry appeared to be missing. The medical examiner opined that the cause of death was strangulation and that Paviol had been dead approximately two days as of November 10. He could not be more precise as to time of death because of decomposition.

At approximately 5 A.M. on November 8, two days before Paviol's body was discovered, Randy Foster was awakened by the sound of a woman screaming. The sound came from the vicinity of the adjoining apartment building at 103 Spring Street. He also heard banging sounds after opening his window. The sound stopped after he telephoned the police. The police arrived within minutes, and Foster met them outside. The police could detect no wrongdoing, so they left. The defendant's brother, Reginald Jackson, who lived in a three-room apartment next to Paviol's, was also awakened by the screams and the banging. He went to the window and saw someone matching Foster's description. He also noticed that the defendant, who had been staying with him for about three weeks, was not in the apartment. The defendant had been in the living room watching television when Reginald Jackson came home from work at 1:30 A.M. on November 8. Reginald went to bed at about 4 A.M. that morning. On November 10, after discovering Paviol's body, the police spoke to Reginald for about fifteen minutes.

The police found the defendant's fingerprints inside Paviol's

[1]The jury found the defendant guilty of murder in the first degree on a theory of felony-murder based on two separate felonies: assaultive burglary, G. L. c. 266, § 14, and unarmed robbery, G. L. c. 266, § 19 (*b*).

apartment. They returned to Reginald's apartment on November 13 with a search warrant. Reginald signed a consent form authorizing the search of his apartment. The police seized several items, including a bag with women's jewelry, subsequently identified as Paviol's, found among the defendant's belongings. Detectives asked the defendant if he would talk with them at the police station, and he agreed.

At the police station, the defendant was advised of the Miranda warnings and his right to use a telephone. He acknowledged his rights both orally and in writing. After reading the Miranda warnings aloud from a waiver form, he initialed each warning on the form and signed the form. He denied being in Paviol's apartment, and said his brother woke him at about 4 or 5 A.M. on Friday (November 8) to say he heard a "boom and a thump and somebody yelling." Police typed his statement and read it to him. The defendant read it as well, then signed it. After the completion of the statement, the detectives went to their sergeant and learned that the bag of jewelry found among the defendant's belongings possibly belonged to Paviol.

They returned to the room where the defendant was waiting and told him he was under arrest for murder. They again advised him of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and to the use of a telephone, and further advised him of his right to a prompt arraignment. The defendant initialed the typed warnings and signed the waiver forms. The detectives told the defendant that they found his fingerprints in Paviol's apartment, as well as a footprint that they believed was his. They also told him about the bag of jewelry found among his belongings. At first the defendant said he purchased the jewelry on the street, but later admitted taking the jewelry from Paviol's apartment. He said he went into her apartment on Saturday afternoon, November 9, after noticing that the back door was unlocked. She was already dead. He walked through her apartment and took her jewelry, some cash, and her automatic teller machine (ATM) bank card. He said he later tried using the card, but the ATM "ate the card" because he did not know her personal code. The defendant signed his second statement. Bank records confirmed that an ATM "captured" Paviol's card at about 9:45 P.M. on November 9 after someone unsuccessfully tried four times to withdraw one hundred dollars.

The defendant's fingerprints were found in Paviol's apartment on a can of cocoa on the kitchen counter, on a living room

wall, and on the hot water faucet in the bathroom. The defendant left a bloody "transfer"[2] footprint on Paviol's living room floor which only could have been made within about five minutes of Paviol's blood being spilled, before it had dried. Further, the "take-away" print was obliterated when something was smeared through the wet blood.

2. *Motion to suppress statements.* The defendant claims that the motion judge, who was also the trial judge, erred by failing to suppress the statements he gave to the police[3] on grounds that they were not made voluntarily and were not made after a knowing, intelligent, and voluntary waiver of his Miranda rights.

The Commonwealth bears the burden of proving beyond a reasonable doubt that, in the totality of the circumstances, the defendant voluntarily, knowingly, and intelligently waived his Miranda rights. *Commonwealth* v. *Edwards*, 420 Mass. 666, 669-670 (1995). *Commonwealth* v. *Day*, 387 Mass. 915, 920-921 (1983). The judge's findings are entitled to substantial deference. *Commonwealth* v. *Edwards*, *supra* at 670. *Commonwealth* v. *Day*, *supra* at 920.

The Commonwealth also bears the burden of proving beyond a reasonable doubt that, in the totality of the circumstances, the defendant's statements were made voluntarily. *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995); *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). A statement is voluntary if it is "the product of a rational intellect and a free will." *Commonwealth* v. *Davis*, 403 Mass. 575, 581 (1988), quoting *Blackburn* v. *Alabama*, 361 U.S. 199, 208 (1960). See *Commonwealth* v. *Selby*, *supra* at 662-663. A judge's findings as to the voluntariness of a statement are also granted substantial deference, *Commonwealth* v. *Mandile*, 397 Mass. 410, 412 (1986), but they "must appear from the record with unmistakable clarity." *Commonwealth* v. *Tavares*, *supra* at 152, quoting *Sims* v. *Georgia*, 385 U.S. 538, 544 (1967).

The voluntariness of a Miranda waiver and the voluntariness

---

[2]A "transfer" footprint is an impression left on a dry surface after first stepping on a wet surface. A "take-away" footprint is an impression left behind on a wet surface after stepping on it.

[3]The defendant also moved to suppress statements he made to some inmates. The motion also was denied as to those statements, but the Commonwealth never offered them at trial, so we need not consider them. See *Commonwealth* v. *James*, 424 Mass. 770, 779 n.16 (1997); *Commonwealth* v. *Kickery*, 31 Mass. App. Ct. 720, 725 n.5 (1991).

of a statement are separate and distinct inquiries, but the "totality of the circumstances" test under each analysis is the same. *Commonwealth* v. *Edwards, supra* at 670. Relevant factors to consider include, but are not limited to, "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile, supra* at 413. See *Commonwealth* v. *Selby, supra* at 663. If the police inadvertently fail to advise a defendant of his right to use the telephone, that is a factor to be considered. *Commonwealth* v. *Meehan,* 377 Mass. 552, 567 (1979), cert. dismissed, 445 U.S. 39 (1980). The defendant focuses our attention on the factor of his intelligence. As to that, we have said "[t]he police, and ultimately judges, must give special attention to whether a person of low intelligence waived Miranda rights and voluntarily and knowingly made a statement to the police." *Commonwealth* v. *Hartford,* 425 Mass. 378, 381 (1997). We have also said that "people with low intelligence may waive their rights." *Id.*

The defendant was thirty-three years old at the time of the interrogation. The judge found that the police treated him "with courtesy and respect," and did not "pressure or coerce the defendant in any way." The defendant demonstrated no difficulty understanding or communicating with police and appeared calm and composed.

The defendant's expert, a neuropsychologist, testified that the defendant had an intelligence quotient (IQ) of sixty-five, was mentally retarded, and as a result was incapable of freely waiving his rights or freely communicating with the police. The judge found her testimony unpersuasive and instead credited the testimony of the Commonwealth's expert, who opined that the defendant most likely had an IQ in the eighties and suffered from a learning disability. In support of his decision, the judge found that "[t]he defendant attended Springfield public schools, and was *never* diagnosed as being retarded . . . [and] that he spent much of his time in the regular classroom . . . . The defendant was able to hold down at least three full-time jobs in the course of his lifetime, and was never fired or laid off for failure to perform his work appropriately." Cf. *Commonwealth*

v. *Hartford, supra* (evidence that defendant of low intelligence held various part-time jobs probative of his capacity to understand and waive Miranda rights). The judge also found it "significant that the defendant did not simply 'cave in' to police pressure and confess to this heinous crime immediately upon being accused of it by the police. Instead, he gave a completely exculpatory statement at the outset, and after being confronted with the physical evidence against him, he changed his statement to give a plausible explanation of the physical evidence while still denying any responsibility for the homicide." See *Commonwealth* v. *Wallen,* 35 Mass. App. Ct. 915, 917 (1993) (efforts by defendant of low intelligence to exculpate himself support finding of capacity to understand and waive Miranda rights). The judge concluded that this level of "cunning," together with the defendant's "considerable prior experience with the police and in receiving Miranda warnings"[4] indicated that the defendant "was well aware of the possible consequences of waiving his rights and speaking to the police." Cf. *Commonwealth* v. *Hartford, supra.*

The judge correctly noted that, in these circumstances, this defendant's IQ alone does not require suppression of his statements, but is a factor to be considered. See *Commonwealth* v. *Hartford, supra* at 380-381, and cases cited. The judge carefully considered the question of the defendant's intelligence and concluded that, in the totality of the circumstances, the Commonwealth had met its burden. That conclusion is supported by the evidence, and we accept it. See *Commonwealth* v. *Magee,* 423 Mass. 381, 386-387 (1996); *Commonwealth* v. *Tavares, supra* at 145. His findings as to the voluntariness of the statements appear with "unmistakable clarity." *Id.* at 152.

3. *Motion for required findings of not guilty.* The defendant moved for required findings of not guilty at the close of the Commonwealth's case, and again at the close of all the evidence. Both motions were denied. Our review proceeds under the standard set forth in *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979).

(a) *Deliberate premeditation.* The defendant argues that the Commonwealth failed to prove beyond a reasonable doubt that he had the mental capacity to form a specific intent to kill. He also challenges the sufficiency of the evidence as to whether he

---

[4]The defendant had been incarcerated in State prison on two prior occasions.

was present in Paviol's apartment when she was killed. These arguments have no merit.

The evidence warranted a finding that Paviol confronted the defendant at the rear door of her apartment. A struggle ensued in which various items of furniture were knocked over. The defendant probably struck Paviol in the face knocking off her wig and eyeglasses, and causing her to bleed. While she screamed and struggled the defendant dragged her into the bedroom, then strangled her to death. We have said that 'a killing by manual strangulation in the course of a struggle is "adequate evidence of premeditation." *Commonwealth* v. *Forde*, 392 Mass. 453, 457 (1984). Evidence of premeditation necessarily includes evidence of an intent to kill. See *Commonwealth* v. *Richardson*, 425 Mass. 765, 768 (1997); *Commonwealth* v. *Gibson*, 424 Mass. 242, 247, cert. denied, 512 U.S. 1123 (1997). The fact that the defendant presented evidence of an inability to form an intent to kill is of no consequence, because the standard of review requires us to view the evidence in the light most favorable to the Commonwealth. A jury was not required to believe the defendant's evidence. See *Commonwealth* v. *Gould*, 380 Mass. 672, 679 (1980). Cf. *Commonwealth* v. *Keita*, 429 Mass. 843, 845-849 (1999) (jury free to disbelieve defendant's expert testimony on insanity, even where Commonwealth presents no expert testimony in rebuttal). It is not our function to weigh that evidence under this analysis, as the defendant requests.

(b) *First degree felony-murder.*

(i) *Assaultive burglary.* The defendant argues that the absence of evidence that a weapon was used precludes consideration of assaultive burglary, G. L. c. 266, § 14,[5] as the basis for a conviction of felony-murder in the first degree. The defendant relies

[5]General Laws c. 266, § 14, as amended by St. 1966, c. 330, in effect at the time the offense was committed, provided: "Whoever breaks and enters a dwelling house in the night time, with intent to commit a felony, or whoever, after having entered with such intent, breaks such dwelling house in the night time, any person being then lawfully therein, and the offender being armed with a dangerous weapon at the time of such breaking or entry, or so arming himself in such house, or making an actual assault on a person lawfully therein, shall be punished by imprisonment in the [S]tate prison for life or for any term of not less than ten years. The sentence imposed upon a person who, after being convicted of any offence mentioned in this section, commits the like offence, or any other of the offences therein mentioned, shall not be suspended, nor shall he be placed on probation."

on *Commonwealth* v. *Claudio*, 418 Mass. 103, 109 (1994), where we said "that the elements of a breaking and entering in a residence in the night time sufficiently distinguish a violation of G. L. c. 266, § 14, from armed assault in other circumstances, so as to justify treating a violation of that statute as predicating a charge of murder in the first degree by reason of felony-murder." It may seem confusing at first that the defendant would cite the authority that stands precisely for the opposite proposition he advances, until it is revealed that he included only a portion of the quoted sentence in his brief. He omitted everything after the last comma, and thereby blatantly distorted the meaning of the material he quoted. In addition, the context in which the quoted sentence appears is a discussion of the merger doctrine in which we concluded that assaultive burglary is an independent felony for purposes of felony-murder. *Id.* See *Commonwealth* v. *Quigley*, 391 Mass. 461, 465-466 (1984), cert. denied, 471 U.S. 1115 (1985).

Whether a crime qualifies as a predicate offense for purposes of first degree felony-murder depends on whether the offense is punishable by death or life imprisonment. See *Commonwealth* v. *Fluker*, 377 Mass. 123, 128 (1979). Predicate offenses then fall into two categories: those that are inherently dangerous to human life, and those that are not. If an offense is inherently dangerous to human life, commission of the crime that causes death constitutes first degree felony-murder. See *Commonwealth* v. *Bourgeois*, 404 Mass. 61, 64 (1989). If an offense is not inherently dangerous, then the Commonwealth must prove that the circumstances under which it was committed show that the defendant "consciously disregarded risk to human life." *Commonwealth* v. *Moran*, 387 Mass. 644, 651 (1982) (unarmed robbery is not an inherently dangerous felony).

An inherently dangerous crime does not necessarily require the use of a dangerous weapon. For example, aggravated rape is an inherently dangerous felony for purposes of first degree felony-murder, and it need not be committed with a weapon. See *Commonwealth* v. *Troy*, 405 Mass. 253, 262 (1989). The determination whether a particular felony is inherently dangerous to human life, for purposes of felony-murder, is made on a case-by-case basis. See *Commonwealth* v. *Claudio*, *supra* at 108. In *Claudio*, we concluded that an assaultive burglary under G. L. c. 266, § 14, while armed, was an inherently dangerous offense. *Id.* at 105-109. See *Commonwealth* v. *Berry*, 420 Mass.

95, 109 (1995). Our reasoning in *Claudio* was informed by *People* v. *Miller*, 32 N.Y.2d 157 (1973), where the New York Court of Appeals said that "persons within domiciles are in greater peril from those entering the domicile with criminal intent, than persons on the street who are being subjected to the same criminal intent. . . . When the assault takes place within the domicile, the victim may be more likely to resist the assault [and] less likely to be able to avoid the consequences of the assault, since the paths of retreat and escape may be barred . . . . Further, it is also more likely that when the assault occurs in the victim's domicile, there will be present family or close friends who will come to the victim's aid and be killed." *Id.* at 160-161. Those observations are equally valid whether the intruder is armed or unarmed. It is significant that the Legislature included armed and unarmed assaultive burglary in the same statute and made no distinction between them for purposes of punishment. Either method of committing the crime is punishable by the same, somewhat unusual, minimum mandatory ten-year prison sentence. "In setting that penalty, the Legislature has recognized the risks inherent in an unlawful entry during the night time into a dwelling, which inevitably poses a high degree of danger to any and all occupants." *Commonwealth* v. *Claudio, supra* at 109. We conclude that unarmed assaultive burglary is a felony inherently dangerous to human life for purposes of first degree felony-murder.[6]

(ii) *Unarmed robbery.* To the extent that the defendant also implies that unarmed robbery is not a predicate felony to first degree felony-murder, the argument has no merit. Properly instructed as the jury were that the Commonwealth must prove that the defendant committed this crime with a conscious disregard of the risk to human life, the jury could find the defendant guilty of first degree felony-murder based upon the predicate offense of unarmed robbery. See *Commonwealth* v. *Fickett*, 403 Mass. 194, 199 (1988).

The defendant also argues that there was insufficient evidence to support a conviction of felony-murder based on unarmed robbery because the Commonwealth's theory was that the victim

[6]The judge in this case, no doubt out of an excess of caution, where no appellate decision had yet held that unarmed assaultive burglary was an inherently dangerous felony, wisely instructed the jury that the Commonwealth was required to prove that the defendant committed the crime with a conscious disregard of the risk to human life.

was killed to prevent her from identifying the defendant, not to rob her. The balance of this argument is that the robbery was just an afterthought. The Commonwealth's theory as to the robbery, which was supported by the evidence, was that the defendant broke into Paviol's apartment to rob her, then killed her to prevent her from identifying him. The evidence was sufficient to warrant a conviction of felony-murder based on the predicate offense of unarmed robbery.

4. *General Laws c. 278, § 33E.* After reviewing the entire record under G. L. c. 278, § 33E, we decline to reduce the verdict or grant a new trial.

*Judgments affirmed.*