# Commonwealth *vs.* Mark McCray.

Middlesex. April 8, 2010. - August 13, 2010.

Present: Marshall, C.J., Ireland, Spina, Cordy, & Botsford, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Voluntariness of statement, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Voluntariness of statement, Intoxication, Intent, Declaration against interest, State of mind, Admission by silence, Vicarious admission. *Mentally Retarded Person. Intoxication. Intent. Practice, Criminal,* Capital case, Admissions and confessions, Voluntariness of statement, Assistance of counsel, State of mind.

A criminal defendant failed to demonstrate that his trial counsel was ineffective at a hearing on the defendant's pretrial motion to suppress statements that the defendant made to police by failing to offer evidence of the defendant's "mental retardation," illiteracy, and intoxication at the time of his interview with police, where any error by trial counsel, either alone or in combination, would not have influenced the outcome of the proceedings, in that evidence of the defendant's mental impairment was scant and unconvincing, and could not overcome evidence of the voluntariness and intelligence of the defendant's waiver of his Miranda rights. [553-555]

At a murder trial, defendant's counsel was not ineffective in permitting the admission in evidence of the statement of an accomplice, in permitting its admission for the limited purpose of showing the accomplice's state of mind, or in permitting the Commonwealth to introduce the statement in its case-in-chief, where it was not manifestly unreasonable to base the defense strategy on the introduction of the statement (to establish the defendant as an unwitting, weak follower of the accomplice, as a means of avoiding conviction of the defendant of murder in the first degree), in that the Commonwealth's case without the statement was exceedingly strong, and the statement added insight into the accomplice's state of mind from which the jury could infer the defendant's reduced culpability. [555-557]

At the trial of indictments charging, inter alia, murder, a sufficient foundation existed to admit in evidence a witness's testimony regarding facts of the murder that the witness learned from statements of others, made in the defendant's presence, where the Commonwealth established that the defendant manifested his acceptance of the truth of those statements; further, there was no merit to the argument that defendant's trial counsel was ineffective for failing to show that the defendant's lack of sobriety and mental problems precluded him from adopting the statements made by others in his presence, or in failing to suppress those statements. [557-559]

At a criminal trial, defense counsel was not ineffective for not seeking to exclude certain evidence on the ground that it was extremely prejudicial, where it was unlikely that counsel would have prevailed in such an argument. [559-560]

There was no merit to a criminal defendant's argument that, at a murder trial, his counsel abandoned a diminished capacity defense during closing argument. [560-561]

INDICTMENTS found and returned in the Superior Court Department on July 3, 1997.

A pretrial motion to suppress evidence was heard by *Raymond J. Brassard*, J.; the cases were tried before *Charles M. Grabau*, J., and a motion for a new trial, filed on July 18, 2003, was heard by him.

*John H. LaChance* for the defendant.

*Kevin J. Curtin*, Assistant District Attorney, for the Commonwealth.

CORDY, J. On the evening of March 25, 1997, a young woman was tied up, beaten, burned, stabbed, urinated on, and finally murdered with a sledgehammer in an abandoned trailer in Cambridge. The trailer was set ablaze and the victim's body was charred beyond recognition. Based on a forensic investigation, the woman was identified as a nineteen year old, sometimes homeless woman who associated with a community of individuals that included Nichole Fernandes; Randy Williams; and the defendant, Mark McCray. Based on tape-recorded interviews with Fernandes, Williams, and the defendant, the police learned that each had participated in the victim's murder. During his tape-recorded interview with police, the defendant confessed to being present in the trailer and to handing Fernandes the sledgehammer that was used to kill the victim.

The defendant was indicted for murder in the first degree; kidnapping; and four counts of assault and battery by means of a dangerous weapon, specifically, a sledgehammer, fire, scissors, and thorns.[1] Prior to trial, the defendant filed a motion to suppress his tape-recorded statements to the police, arguing that he did not voluntarily and intelligently waive his Miranda rights under the Fifth Amendment to the United States Constitution. After a hearing, the motion judge made oral findings of fact and denied the defendant's motion.[2]

The defendant also filed a motion in limine to permit him to

---

[1]The defendant also was indicted on a charge of arson of a dwelling house, but it did not reach the jury.

[2]The motion judge was not the trial judge.

admit the tape-recorded confession of Fernandes for the limited purpose of showing her state of mind as the leader of the murderous enterprise. Over the Commonwealth's objection, the trial judge allowed the motion. At the same time, the Commonwealth filed a motion in limine to introduce statements made by Fernandes and Williams to a third party in the presence of the defendant that implicated him in the crime. Over the defendant's objection that he did not adopt those statements, the judge permitted the third party to testify, subject to the Commonwealth's laying a sufficient evidentiary foundation from which the jury could conclude that the defendant did, in fact, adopt the statements made about his conduct.

The defendant was convicted on all charges as a joint venturer. On the murder indictment, the jury found the defendant guilty of premeditated murder as well as murder committed with extreme atrocity or cruelty. He was sentenced to a term of life without parole for the murder conviction, a concurrent term of from nine to ten years for each of the four assault and battery with a dangerous weapon convictions, and a term of from nine to ten years for the kidnapping conviction, to be served at the conclusion of the life sentence. The appeal was entered in this court on December 17, 2001, but the appeal was stayed on July 22, 2003, after the defendant filed a motion for a new trial. After the denial of that motion, his appeal from its denial was consolidated with his direct appeal.

On appeal, the defendant argues that his trial counsel rendered ineffective assistance in violation of the defendant's State and Federal constitutional rights. None of the claimed ineffectiveness, however, rises to the level of constitutional deficiency. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Additionally, we have examined the entire record of the defendant's case and find no reason why his convictions should be reversed or reduced in degree under G. L. c. 278, § 33E.

1. *Background.* a. *Trial.* The jury could have found the following facts based on the defendant's statements to police, his statements to third parties, or statements implicating the defendant made in his presence to which he manifested acceptance.

On the evening of March 25, 1997, the victim ate dinner with the defendant, Williams, Fernandes, and another man at a shelter in Boston. The defendant, Williams, and Fernandes felt that the

victim had been spreading rumors about them — in their words, "talking against the family," a group of individuals who watched out for each other on the streets of Boston. After dinner, they invited the victim to join them at a trailer nearby in Cambridge. The victim and Fernandes left; the defendant and Williams followed.

Once inside the trailer, the four shared some marijuana and beer, and then the victim was tied up with wire. Fernandes, Williams, and the defendant then began to beat the victim. They cut her hair with scissors and lit the victim's head on fire. Fernandes struck the victim with thorns and stabbed her in the back of the neck with the scissors. While the scissors were lodged in the victim's neck, the defendant struck her hard enough to knock her out of the chair in which she was seated. As a result, Fernandes could not remove the scissors. The defendant then urinated into the victim's mouth, causing her to choke. At some point, the three aggressors took a break to consume more beer and marijuana before recommencing their assault.

With the victim in dire circumstances, the defendant told the others that they had gone far enough. He felt that the only crime they had committed so far was assault and battery, but the others thought differently. Fernandes recognized that their actions amounted to an attempted murder, and she pleaded with the others to allow her to execute the victim. At Fernandes's request, the defendant handed her a small sledgehammer covered in a blanket. She placed the blanket over the victim's head and then pulled it back, brandishing the sledgehammer to the victim. "This," said Fernandes, "is what I'm gonna kill you with." Placing the blanket back over the victim's head, Fernandes proceeded to beat her with the sledgehammer until she died. Fernandes then took some paper and ignited a tarp inside the trailer. Soon the entire trailer was in flames.

Medical examinations confirmed injuries consistent with strikes from fists, a shod foot, a sharp instrument, and a hammer. A blanket was found wrapped around the victim's head. A hammer head, scissors, and wire were all found in the charred remains of the trailer.

With the trailer on fire, the group left the area and stole two cars before departing for a shelter at approximately 6 A.M. on

March 26. At the shelter, the three encountered Jerry Johnson and told him what had taken place the night before. The defendant told Johnson that they "took care of that problem" and made a slicing gesture to his throat. Later that day, Johnson had another conversation with the defendant, Fernandes, and Williams about the murder. Although Fernandes did most of the talking, all three participated. For example, the defendant told Johnson that he had knocked the victim from her chair, and when Fernandes told Johnson that the defendant had urinated on the victim, the defendant smiled and nodded his head.

That evening, the defendant spoke with Johnson alone, again telling him about the murder. He said that he had not wanted to kill the victim but that "sometimes the juices get flowing and you do more than what you intended to do." When Johnson raised concerns that the defendant would be implicated in the murder when the other two were caught, the defendant assured him that no one had seen him leave with the victim because Fernandes and the victim left first, and that he had worn gloves so that his fingerprints would not be found at the scene. During all three conversations with Johnson, the defendant appeared sober and coherent. In a conversation some days later with a woman named Karen O'Brien and her boy friend, the defendant said that the victim "ain't gonna be bothering nobody no more."

After the murder, the defendant, Williams, and Fernandes made a brief trip to Framingham, and over the next few days Williams and Fernandes would not allow the defendant out of their sight. By April 6, however, the three had separated. The defendant was trying to avoid the others.

The State police investigation into the murder led to an interview with Fernandes in a doughnut shop on March 28, and another on April 6, at a police station. In the second interview, Fernandes confessed to the murder in a tape-recorded statement. Fernandes coolly and without apparent remorse recounted the details of the murder, painting herself as the ringleader and as the victim's "worst fear incarnate." She downplayed the others' involvement, asserting that the defendant had asked her not to kill the victim and that he never struck the victim. She said that the defendant urinated in the victim's mouth at her instruction and claimed that the she had told the defendant that she would

kill him if he went to the police. On the defendant's motion
(but during the Commonwealth's case), a tape recording of
Fernandes's confession was played for the jury at trial for the
limited purpose of showing her state of mind. Thus, when
Fernandes downplayed the involvement and complicity of Wil-
liams and the defendant, those statements could not be used for
substantive purposes. Rather, they showed Fernandes acting as a
ringleader, ordering the defendant around.[3]

The State police located the defendant on April 8 outside a
bar in Chelsea. He voluntarily returned with them to their office
and agreed to have his interview tape recorded. During the
interview, the defendant admitted to being present in the trailer
for the murder, but he denied participating in it. He did, however,
confirm that the victim had been beaten, thrashed with thorns,
burned, stabbed, and eventually murdered with a sledgehammer.
He also stated that he was afraid of being attacked by Fernandes,
but admitted to handing her the sledgehammer and blanket just
prior to the final murderous assault. A tape recording of the
defendant's statements was played for the jury.[4]

b. *Motion to suppress.* Prior to trial, the defendant filed a mo-
tion to suppress the contents of his interview. His motion asserted
that his level of intoxication at the time of the interview, com-
bined with the fact that he "possibly" was "retarded" or suffered
from "some" mental illness, rendered his statements to police
inadmissible. He contended that his statements were not voluntar-
ily made, and that he never voluntarily and intelligently waived
his Miranda rights. See *Commonwealth* v. *Jackson*, 432 Mass. 82,
85-86 (2000); *Commonwealth* v. *Edwards*, 420 Mass. 666, 670
(1995). After a hearing, the motion judge found the following
facts, all of which were supported in the hearing record.

Once the State police located the defendant outside the bar in
Chelsea at 2 P.M., they asked if he was willing to speak with
them at their office about "something important." After the
defendant agreed to return with the officers, they pat frisked the

---

[3]Based on their interview with Nichole Fernandes, the police located Randy
Williams, who gave them a statement as well. The contents of the statement
by Williams were not introduced at trial.

[4]The tape recording was partially redacted to remove references by the
police officers to statements made by Fernandes.

defendant and then placed him in their vehicle. He was not under arrest at that time.[5] During the ride, the officers declined to speak with the defendant, stating that they preferred to speak at their office.

When they arrived at the office (located in the office of the district attorney for the Middlesex district), the defendant was placed in a conference room.[6] The officers read Miranda warnings from a card and gave the card to the defendant to read and sign. The defendant appeared to read it, said that he understood his rights, and indicated that he wished to speak to the officers.[7]

The officers proceeded to explain that they were investigating the victim's death. The defendant acknowledged that he knew the victim, as well as Fernandes and Williams. He initially denied knowing that the victim was dead or having been to the trailer. However, when he was told that Fernandes and Williams had been arrested and had said that the defendant was present at the time of the murder, the defendant acknowledged his presence at the scene. The officers then asked the defendant's permission, and he agreed, to record their conversation.

The tape-recorded conversation begins with one of the officers reading the defendant his rights again and the defendant again stating that he understood them and that he wished to speak to the officers. During the interview, the defendant discussed the events of March 25 at length but was careful to exculpate himself from direct involvement in the murder. He denied ever touching the victim and stated that Williams and Fernandes threatened his life when he tried to object. When confronted with information that he had urinated on the victim, the defendant claimed that the others had poured his urine on her after he relieved himself into a cup in the trailer.

After approximately twenty-five minutes of tape-recorded conversation, one of the officers asked the defendant if he was under the influence of any drugs or alcohol at the time. The

[5]One of the officers testified at the hearing that the defendant would have been arrested had he declined to speak with the officers.

[6]The conference room was not a traditional suspect interview room. It was situated among cubicles and had windows from the floor to the ceiling.

[7]The defendant appeared to read the card, but he now asserts that he cannot read. The officers did not ask the defendant whether he could read.

defendant responded that he had smoked some marijuana just prior to being approached by the officers. When the officers asked if the defendant was sober and whether he understood everything they were asking him, the defendant responded affirmatively. When one officer began asking him whether he understood, the defendant interrupted and completed the statement with "my rights."[8]

At that point, the officers stopped the tape recorder for a period of five minutes. They conferred among themselves and concluded that they had forgotten to ask about certain details with respect to the actions of the defendant and the others after the trailer was burned. They asked if they could recommence recording, and the defendant agreed. After a brief discussion about the stolen motor vehicles, the officers once again stopped the tape recorder.

After the second portion of the interview, the officers placed the defendant under arrest for being an accessory after the fact to the victim's murder. One of the officers left the room to confer with a superior officer, and the other officer stayed in the conference room with the defendant. The defendant was given the opportunity to make telephone calls. He contacted a person whom the defendant referred to as his "caretaker" or "payee." The officer in the room took this to mean that the woman handled the defendant's money because of his prior history with the law.[9] While making telephone calls, the defendant volunteered to the officer that he had touched the sledgehammer. The officer alerted his partner to the development, and after conferring together, they decided to ask the defendant more questions about the murder. Once again, the interview was tape recorded.

The third segment of the interview opens with one of the officers reminding the defendant that he still had "Miranda rights" and confirming that he had "no problem" going back on tape.

---

[8] The motion judge inquired of the police officer why he had asked about the defendant's sobriety after twenty-five minutes. The officer replied that he simply had wanted to make sure he got the statement "on the tape" and that the defendant's answers had confirmed his opinion that the defendant was, in fact, sober. The officers generally were aware that the defendant was a drug and alcohol user.

[9] No conclusive explanation as to why the defendant has a payee was ever established, either during the suppression hearing or the trial. The implication on appeal is that the defendant's low intelligence makes it difficult for him to manage his disability benefits.

The defendant responded, "[Y]eah." The defendant was asked about the entire murder again, including the fact that the defendant had handed the sledgehammer to Fernandes at her request.

After listening to the testimony and the tape-recorded interview of the defendant, the motion judge found that the officers' tone throughout the interview was "business-like" and "normal." He found no evidence of any trickery or coercion. The defendant's responses were appropriate, and he appeared to have his self-interest in mind. He exhibited no evidence of mental illness, detachment from reality, or inebriation, and his attitude was "matter of fact" and cooperative, but not "laid back" or "flat." His countenance reflected the seriousness of the situation. Moreover, the defendant's exculpatory statements demonstrated a familiarity with concepts of criminal law, including accessory liability, and throughout the interview he exhibited a level of sophistication and familiarity with regard to his rights and the law. Significantly, the motion judge found that there was no evidence before him that the defendant suffered from "any mental retardation or other mental problem," despite the fact that the defendant's motion to suppress made assertions to that effect. Accordingly, the judge concluded that the statements made by the defendant were voluntary and that his waiver of his Miranda rights was valid.

2. *Claims of error.* The defendant claims that he received ineffective assistance from his counsel at both the hearing on the motion to suppress his tape-recorded statements and during trial. The standard of review under G. L. c. 278, § 33E, for claims of ineffective assistance of counsel is more favorable to a defendant than under the Federal or State Constitution. *Commonwealth* v. *Mosher*, 455 Mass. 811, 827 (2010). We "consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). See *Commonwealth* v. *Mosher, supra* ("We examine the defendant's claim of ineffective assistance of counsel under G. L. c. 278, § 33E, . . . to determine whether there was a serious failure by trial counsel and, if so, whether the failure resulted in a substantial likelihood of a miscarriage of justice").

a. *Ineffective assistance at suppression hearing.* The defendant asserts that his attorney failed to offer evidence of "mental retardation," illiteracy, and intoxication at the time of the interview to support his written motion to suppress. Had such information been proffered, the defendant argues, his motion to suppress would have been granted.

Defense counsel did not present any evidence at the motion hearing. As a consequence, the assertions made in his prehearing motion that the defendant "seems to have some mental illness and possibly may be retarded" were left unproved. Similarly, counsel did not prove that the defendant was illiterate or that he suffered from lead paint poisoning, as had been suggested in his motion to suppress. The question before us is whether the disparity between what counsel claimed on paper and what counsel proffered at the hearing was the result of an error by trial counsel, and whether that error likely influenced the outcome of the proceedings. *Commonwealth* v. *Wright, supra.*

To be valid, a Miranda waiver must be voluntary, knowing, and intelligent. Such determinations are based on the totality of the circumstances surrounding the waiver, *Commonwealth* v. *Edwards,* 420 Mass. 666, 670 (1995), and the burden is on the Commonwealth to prove the adequacy of a waiver beyond a reasonable doubt. *Commonwealth* v. *Magee,* 423 Mass. 381, 386 (1996). Additionally, the Commonwealth must prove, based on the same totality of the circumstances, that the statements themselves were made voluntarily. *Commonwealth* v. *Jackson,* 432 Mass. 82, 85-86 (2000). Certainly, evidence of "mental retardation," intoxication, or other mental impairment bears on that totality. See *Commonwealth* v. *St. Peter,* 48 Mass. App. Ct. 517, 519-520 (2000). Accordingly, a failure to present such evidence, when available, could be a serious one. In this case, however, such evidence is scant, and where it exists it is unconvincing.

Literacy is not required for a valid waiver of Miranda rights. See *Commonwealth* v. *Taylor,* 398 Mass. 725, 728 (1986). Thus, had defense counsel proved that the defendant lacked the ability to read the Miranda card presented to him, he still would have had to establish that the verbal warnings he received were insufficient. There is nothing in the record — proved or alluded to — that suggests that the defendant's alleged inability to read

the card undercut or tainted the adequate warnings that were given to him first, and then again. To the contrary, the defendant exhibited sophistication and familiarity with his rights at the time of the interview.

Similarly, "mental retardation" or mental illness, while relevant, do not preclude the making of voluntary statements or waivers. See *Commonwealth* v. *Hilton*, 443 Mass. 597, 606-607 (2005); *Commonwealth* v. *Jackson*, *supra* at 87 ("defendant's IQ [intelligence quotient] alone does not require suppression of his statements, but is a factor to be considered"). Evidence of such impairments requires suppression only where the defendant is rendered incapable of giving a voluntary statement or waiver. *Commonwealth* v. *Vazquez*, 387 Mass. 96, 99-100 & n.8 (1982) (suppression turns on whether statements were "product of a rational intellect").

Defense counsel did not submit evidence of the defendant's mental acuity during the suppression hearing, but at trial he did mount a defense based on the defendant's low intelligence. Accordingly, whether he presented it at the hearing or not, we are privy to what the defendant's case on that point could have been. At trial, an expert for the defense testified that the defendant suffered from "mild mental retardation." He based his testimony on psychological and intelligence tests dating back to 1978. However, his testimony was contradicted severely both during cross-examination and through the testimony of an expert called by the Commonwealth, who testified that a more thorough review of the defendant's testing history plainly revealed him to be suffering primarily from a lack of education, rather than "mental retardation." It was not ineffective assistance of counsel to omit this weak evidence from the suppression hearing; it would have made no difference in the outcome.[10]

Likewise, the evidence that the defendant was "heavily" intoxicated during his interview with the police was unpersuasive. The

[10]The defendant also argues that his trial counsel should have ordered a "full battery of neuropsychological tests" based on a suggestion of "possible lead [paint] poisoning" in an examination performed on the defendant in 1980. The 1980 report did not conclude that the defendant suffered from lead paint poisoning. Moreover, the defendant does not claim now that he suffers from it, nor does he establish how such evidence would have altered the result of the suppression hearing.

motion judge listened to the defendant's tape-recorded statement and concluded that he exhibited no signs of intoxication. This was consistent with the defendant's own words. Absent clear error, we accept such findings. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). And absent a showing that evidence to the contrary existed, we will not hold defense counsel's failure to present nonexistent evidence to be constitutionally deficient. Here, the evidence conclusively showed that the defendant was coherent, rational, and self-serving, thereby precluding any inference that his stated consumption of marijuana interfered with his judgment. *Commonwealth* v. *Silanskas*, 433 Mass. 678, 685-686 (2001).

Finally, the combination of defense counsel's alleged omissions did not amount to ineffective assistance of counsel. The omitted evidence, to the extent that it existed, could not have overcome the voluntariness and intelligence that were self-evident in the recording.

b. *Decision to admit Fernandes's statement.* Defense counsel faced a difficult challenge in seeking to obtain an acquittal for his client, whose presence, involvement, and motive in this admittedly horrific crime were all established by direct evidence. Moreover, the evidence of the defendant's low mental acuity was not strong. The defendant's only realistic chance to avoid a conviction of murder in the first degree was to prove that he lacked the necessary specific intent to kill the victim. Therefore, defense counsel sought to prove that the defendant was a "follower," susceptible to the influence and control of a powerful ringleader. Fernandes, who carried out the murder as well as most of the assault, fit that description, and nothing revealed her malevolent and controlling personality better than the tape recording of her confession, a measured, unremorseful statement of complete responsibility for the crime that contrasted directly with the defendant's evasive, self-serving statement to the police. Accordingly, defense counsel sought, over the Commonwealth's objection, to admit Fernandes's statement.

The Commonwealth objected to the admission of Fernandes's statement on the basis that it was hearsay that was not sufficiently corroborated to qualify under the exception for the admission of statements against penal interest. See Mass. G. Evid.

§ 804(b)(3) (2010). See also *Commonwealth* v. *Carr*, 373 Mass. 617, 623-624 (1977). Defense counsel responded that it was not his intention to offer the Fernandes statement for the truth of its contents; rather, his goal was to show "the nature of [Fernandes's] personality . . . and that she was the strong . . . leader in the matter." By using the statement to show Fernandes's state of mind, counsel believed the jury would see the defendant "as more of a follower." The judge accepted defense counsel's argument that the Fernandes statement was admissible to prove Fernandes' state of mind and, on that basis, overruled the Commonwealth's objection that the statement was not sufficiently corroborated. Defense counsel also told the judge that he had discussed "in depth" with the defendant the risks of introducing the Fernandes statement.

The Commonwealth, concerned that a failure to do so would cause the jury to think the prosecution was hiding the Fernandes statement, offered to introduce the tape recording during its case, an offer that was accepted by the judge and defense counsel. The judge instructed the jury at that time that they could consider the statement "only for the limited purpose . . . of showing the state of mind of Nichole Fernandes."

The defendant now argues that defense counsel's actions constituted ineffective assistance of counsel on several grounds. His primary argument is that it constituted ineffective assistance to admit the statement for the limited purpose of showing Fernandes's state of mind. He argues that the limited purpose prevented the jury from considering the truth of certain statements by Fernandes that partially exculpated the defendant, for example, that the defendant never struck the victim. The defendant also asserts that trial counsel was deficient when he acquiesced to the Commonwealth's use of the Fernandes statement in its case-in-chief, as opposed to attempting to save it for the defendant's case. Finally, the defendant argues that it constituted ineffective assistance of counsel to permit the admission of the Fernandes statement in the first place.

Again, we scrutinize claims of ineffective assistance in a case of murder in the first degree for errors that likely influenced the jury. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). "In determining whether there has been a serious failure, we give

trial counsel's tactical decisions due deference, and 'do not "second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty." ' " *Commonwealth* v. *LaCava*, 438 Mass. 708, 713 (2003), quoting *Commonwealth* v. *Street*, 388 Mass. 281, 285 (1983). Accordingly, we will not find ineffectiveness unless the tactical decision was "manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998).

As a preliminary matter, it was not manifestly unreasonable to base the defense strategy on the introduction of the Fernandes statement. As discussed above, establishing the defendant as an unwitting, weak "follower" of Fernandes likely was the only route by which he could avoid a conviction of murder in the first degree. The defendant now argues that the absence of the Fernandes statement would have left the Commonwealth with an impoverished case based on the defendant's self-interested statement to police and the accounts of third parties. However, the Commonwealth's case without the Fernandes statement was exceedingly strong. Moreover, the Fernandes statement added very little by way of facts to the Commonwealth's case. It was duplicative of other testimony in that regard. What it did add was a direct line into Fernandes's state of mind from which the jury could (but did not) infer the defendant's reduced culpability.

The same analysis holds true for the defendant's other arguments concerning the Fernandes statement. With respect to the limited purpose for which defense counsel successfully argued it was admissible, that limited purpose was entirely consistent with, and indeed drew attention to, the defendant's best case. See *Commonwealth* v. *LaCava*, *supra* at 715-716 (tactical decisions deserve special deference where defendant agreed with tactic at trial). Moreover, the statement's value as substantive exculpatory evidence was counterbalanced by its inculpatory contents. See *Commonwealth* v. *Mosher*, 455 Mass. 811, 824 (2010). Finally, defense counsel reasonably had to accede to the Commonwealth's decision to offer the statement — for the same limited purpose — in its case. These decisions were not manifestly unreasonable.

c. *Adoptive admissions.* Many of the details about the events in the trailer on the night of the murder were established through

the testimony of Jerry Johnson, to whom the defendant, Williams, and Fernandes recounted their actions on three separate occasions on March 26. At one point or another, Johnson learned all the salient facts of the murder, including that the defendant participated in beating the victim, urinated on her, acquiesced to Fernandes's assertion that the murder was necessary once the victim suffered enough injuries to constitute attempted murder, and took precautions to avoid leaving fingerprints at the crime scene.

Johnson learned some of these facts from the defendant directly, and others from Williams or Fernandes in statements made in the defendant's presence. The Commonwealth filed a motion in limine to admit the statements by Williams and Fernandes against the defendant, arguing that they qualified as adoptive admissions of the defendant. See Mass. G. Evid. § 801(d)(2)(B) (2010). See also *Commonwealth* v. *Olszewski*, 416 Mass. 707, 719 (1993), cert. denied, 513 U.S. 835 (1994) (admissions by silence admissible only if defendant heard and understood statement, had opportunity to respond, and would have been expected to respond); *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 506 (1992) ("Where a party is confronted with an accusatory statement which, under the circumstances, a reasonable person would challenge, and the party remains silent or responds equivocally, the accusation and the reply may be admissible on the theory that the party's response amounts to an admission of the truth of the accusation"). At the time, defense counsel countered that there was insufficient evidence to establish that he had adopted the others' statements. The judge decided to allow Johnson to testify, subject to objections made by defense counsel at that time.

When it came time for Johnson to testify, the Commonwealth repeatedly asked him to discuss the defendant's conduct when either Fernandes or Williams made statements that inculpated him. Johnson stated that the defendant smiled, nodded, or interjected his own inculpatory statements throughout.[11] Additionally, Johnson testified that the defendant appeared sober, coherent, and rational.

Defense counsel did not object to Johnson's testimony.

---

[11]The judge delivered a humane practice instruction before Johnson testified.

However, any such objection would have been futile because, at every turn, the Commonwealth established that the defendant manifested his acceptance of the truth of the statements by Williams and Fernandes. See *Commonwealth* v. *Olszewski, supra*; *Commonwealth* v. *MacKenzie, supra.* The judge anticipated a request for a jury instruction on adoptive admissions, and the jury were told that they had to confirm that the defendant heard any accusation against him and that a reasonable person would have challenged such accusations if they were untrue. "Adoptive admissions are 'little more than a special case of voluntary admissions by parties.' " *Commonwealth* v. *Silanskas*, 433 Mass. 678, 694 (2001), quoting *Commonwealth* v. *Babbitt*, 430 Mass. 700, 706 (2000). In the circumstances, there was sufficient foundation to admit the statements made in the presence of the defendant on that basis.

The defendant contends that his counsel was ineffective for failing to show that the defendant's lack of sobriety and (undefined) mental problems precluded him from adopting the statements made in his presence by Williams and Fernandes. He also suggests that it was ineffective assistance for his counsel to fail to suppress the statements. However, both arguments are contradicted by the record. First, defense counsel *did* argue before trial that Johnson should not be permitted to testify about what Fernandes and Williams said. His lack of success is not evidence of ineffectiveness; rather, it resulted from the fact that the statements were admissible once the Commonwealth made certain showings. Second, defense counsel *did* ask Johnson about the defendant's use of drugs. Johnson confirmed that the defendant had begun using drugs around the time he began associating with Fernandes and Williams, but never contradicted his assertion that the defendant was sober and rational when the others implicated him in the murder.

d. *Prejudicial evidence.* The defendant argues that his counsel should have sought to exclude any evidence that he had urinated on the victim. The jury heard evidence that the defendant had done so from Johnson, who testified that he had been told about the defendant's conduct by both Fernandes and the defendant. Fernandes's recorded statement also included a reference to the act. The defendant argues that this evidence was extremely

prejudicial to him and that his counsel was ineffective for not seeking to exclude it on that basis.

It is unlikely that defense counsel would have prevailed in such an argument. The evidence that the defendant urinated on the victim was relevant to prove his participation in the murderous assault and that the murder was "brutal in the extreme and committed with utter disregard for human decency and life" amounting to extreme atrocity or cruelty. *Commonwealth* v. *Hogan*, 426 Mass. 424, 435 (1998). See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983) (evidence of extreme atrocity or cruelty includes "indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, . . . and disproportion between the means needed to cause death and those employed"). Moreover, Fernandes's statement that she ordered the defendant to urinate in the victim's mouth was probative of the defense's theory that the defendant was a follower.

e. *Abandonment of diminished capacity defense.* Finally, the defendant argues that his counsel abandoned a "diminished capacity" defense during his closing argument. This claim is not supported by the record.

Defense counsel's theory at trial was that the defendant did not share the intent to commit murder with his companions. To that end, defense counsel called as his only witness a psychiatrist who had conducted a clinical interview with the defendant and reviewed the results of the defendant's psychological and intelligence testing. The psychiatrist testified that, in his opinion, the defendant did not suffer from any mental illness (and therefore was criminally responsible for his acts), but that it was unlikely that the defendant could have formed the intent necessary to be found guilty of murder in the first degree on the night in question. He formed his opinion based on the fact that the defendant tested in the "mildly retarded" range of IQ, was intoxicated on the night of the murder, and had a pattern of impulsive behavior that suggested that he was susceptible to the influence of others. In his view, Fernandes was the ringleader of the group, and the defendant was merely caught up in her actions. The Commonwealth rebutted this testimony with a psychiatrist of its own.

Defense counsel's closing argument mirrored the conclusions

of the defendant's psychiatrist. He told the jury that the defendant was an "easily led . . . 'schlepp' " who was "not able to think for himself." However, he also stated that the psychiatrist's testimony did not have a "great deal of significance" except to show that the defendant's intelligence was very low and that he was a "mildly retarded . . . follower." The defendant argues that his counsel's statement about the low significance of the psychiatrist's testimony amounted to an abandonment of the defense. However, this claim is contradicted by the context of counsel's words amidst a forceful argument that relied heavily on the psychiatrist's testimony. *Commonwealth* v. *Nieves*, 429 Mass. 763, 772 (1999) (statements during closing arguments evaluated in context of entire argument). A fair reading of defense counsel's words indicates that he was encouraging the jury to consider all the evidence showing that the defendant did not share Fernandes's intent on the night of the murder.

3. *Conclusion.* We have reviewed the entire record of the case in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the defendant's conviction of murder in the first degree. Nothing in the record raises the likelihood that justice has miscarried. The pretrial and trial portions of the case were undertaken with care and diligence.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*